662 So.2d 525 (1995)
Maudrey Johnson MORRIS
v.
REVE, INC.
No. 95-CA-310.
Court of Appeal of Louisiana, Fifth Circuit.
October 18, 1995.
Rehearing Denied November 17, 1995.
*526 Frank M. Buck, Jr., Robert L. Manard, New Orleans, for Plaintiff/Appellant, Maudrey Johnson Morris.
William C. Shockey, Douglas J. Cochran, Shockey & Ziober, Baton Rouge, for Defendants/Appellees, Reve, Inc. and The Louisiana Home Builders Association Self Insurers Fund.
Before BOWES, GRISBAUM and WICKER, JJ.
BOWES, Judge.
Plaintiff, Maudrey Johnson Morris, appeals a judgment of the Office of Worker's Compensation denying her claim for death benefits arising out of the death of her son, Wendell Morris. For the following reasons we reverse.

FACTS
Wendell Morris was employed by Robert Joseph, a subcontractor of Reve Incorporated, as a cement finisher. On June 16, 1992, Mr. Morris, age 34, collapsed at around one o'clock p.m. while on the job. His coworkers attempted to resuscitate him and an ambulance was called, but Mr. Morris expired from what was later diagnosed as a heart attack.
Mrs. Maudrey Morris filed for compensation benefits, averring that she was financially dependent upon her son. Trial was held; the record was held open for additional fact deposition testimony and medical expert testimony. Following the reception of all the evidence, the judge denied benefits finding that the claimant failed to carry the burden of proving that the heat-related stress suffered by the decedent was the predominant and major cause of his death.

EVIDENCE AND TESTIMONY
A climatology report from the Louisiana State University Office of State Climatology submitted by the claimant evidenced that the temperature that day was 91 degrees, with a heat index of 104 degrees at the time that Mr. Morris collapsed.
Craig Williams, a friend and co-worker of Mr. Morris, testified that he was working with the decedent when he had the heart attack. They were doing cement finishing with a crew totalling six employees, all of whom were doing the same kind of work that day. The two discussed what to do if somebody "passed out." It was extremely hot and humid, and since the cement reflects the sunshine and heat making the temperature even hotter and more unbearable, Mr. Williams, himself, became dizzy several times. At around noon, Mr. Morris also complained of being dizzy and both of them took a break. Mr. Williams returned to the job, but Mr. Morris, who had been stooping down and leaning over was asked by Mr. Joseph if he was all right, but claimant did not reply; he merely waived his hand and walked away. Shortly thereafter, Mr. Morris collapsed.
According to Mr. Williams, usually in cement finishing, work is done early in the morning during the months between May and August stopping working; by 11 or 12 o'clock noonstating "that's when it gets *527 real dangerous and heat exhaustion ... that's a bad time of the day."
Q. When it starts around April and May, do you all follow a different work standards, in terms of avoiding working in noon, 1 o'clock because of the heat?
A. We try to start as early in the morning as possible. If you can't get the cement at [by] a certain time, you just try not to pour it at all.

Q. Was there something that was going on that particular day that you all still had to work through the noon hour?
A. Yeah. When we got out on the job, something was wrong with theI think it was a certain ditch they didn't put in the slab. It was wrong or something. So therefore, when we got there that morning, we had to correct this problem. That is what cause [sic] us to be out there so late, pouring the cement out.
[Emphasis supplied].
Mr. Gregory Joseph also testified that he was working alongside Mr. Morris on the day he died. They were all performing the same job and doing the same work. He agreed that the workers all try to be finished their work early in the day, and the average cement worker does not want to be out there around one o'clock in the afternoon. Mr. Joseph agreed that that time of day is more physically demanding, and "real hot ... rough." Heat exhaustion is the main thing the workers worry about.
Robert Joseph, the self-employed subcontractor for whom decedent worked, testified by deposition. According to him, on the day of the incident Mr. Morris' job was much the same as the other employees working that day.
Dr. Terry Rehn, a cardiologist, testified on behalf of the defendant, rendering his opinion based entirely on the autopsy report. He did not know, nor did he ever treat, Mr. Morris. He verified that the coroner's report stated the decedent suffered from acute coronary insufficiency due to atherosclerotic cardiovascular disease; also, there was a 98% stenosis (blockage) of the left anterior descending coronary artery by atherosclerotic plaque. This is a slow progressive disease. Hyperthermia (the condition in which the body becomes overheated) could not cause the plaque to form during a short period of time. It was his opinion that the pre-existing condition of stenosis was the predominant cause of death. With this blockage, sudden death is not uncommon. Dr. Rehn did not think that doing normal cement-finishing work would have caused Mr. Morris to die if he had not had the blockage. The prognosis for a patient with this amount of blockage is that ultimately most will have a heart attack. "Whether they will die or not just depends upon luck, when it closes off."
The doctor did not know whether the artery was totally blocked at the time Mr. Morris died; people who have blockages can have heart attacks because the vessel totally blocks, or because of an inadequate blood flow which leads to ventricular tachycardia fibrillation (electrical instability in which the heart stops beating in a rhythmic fashion). Dr. Rehn did not know whether the decedent dropped over dead or whether he suffered fibrillation. There are a number of people that have blockages like this that experience sudden death that actually don't have any heart damage. Hyperthermia, which causes blood pressure to drop, could cause that fibrillation effect. Exercise would be a cause for concern for a person with stenosis because of the likelihood of developing the electrical instability. Concerning the element of exercise, Dr. Rehn would be more worried about the rhythm going bad than about the arterial plaque causing a heart attack. The intense heat "absolutely" placed an increased strain on the claimant's heart.
Dr. Rehn felt that statistically speaking, decedent's case fit more within the realm of an arrhythmia. An arrhythmia would not be evident on an autopsy. The heat index clearly contributed to his death but, although Dr. Rehn had a difficult time saying that the stressful conditions were the predominant cause, he did testify that he did not think Mr. Morris would have died at that point in time on that day but for the excessive heat and the stressful conditions under which he was working.
*528 The autopsy report by Dr. Susan Garcia gave "Diagnoses" as coronary insufficiency due to cardiovascular disease and stenosis, with the stenosis of the left anterior descending coronary artery given as a "significant" finding. The death certificate signed by the coroner showed the cause of death as "Myocardial Infarction Atherosclerotic Coronary Artery Disease."

SPECIFICATIONS OF ERROR
Mrs. Morris alleges on appeal:
(1) that it was error for the court to allow the autopsy report into evidence for anything other than establishing the date and time of death;
(2) that the court erred in failing to find that the work being done under the particular conditions present that day was extraordinary and unusual stress under the applicable statute; and
(3) that the court erred in failing to find that such conditions were the predominant and the major cause of death.

ANALYSIS
We find that the death certificate was properly admitted under the Louisiana Code of Evidence, Article 803(9)[1] and is prima facie evidence of the facts contained therein.[2]
We also find that the autopsy report is admissible under rule 2143(1) of the Office of Worker's Compensation Administration, which provides:
Expert medical or rehabilitation testimony may be admitted by: * * * Reports of any health care provider certified as a true copy in accordance with the Louisiana Revised Statutes 13:3715.1 * * *.
Under those rules, the report, if not objected to timely prior to trial, is admissible for all purposes.
The record discloses that claimant has never objected to the authenticity of either the death certificate or the autopsy report. Therefore, we hold that the court did not err in considering these documents.
The relevant portion of the compensation statute La.R.S. 23:1021 is as follows:
7(e) Heart-related or perivascular injuries.
A heart-related or perivascular injury, illness, or death shall not be considered a personal injury by accident arising out of and in the course of employment and is not compensable pursuant to this Chapter unless it is demonstrated by clear and convincing evidence that:
(i) The physical work stress was extraordinary and unusual in comparison to the stress or exertion experienced by the average employee in that occupation, and
(ii) The physical work stress or exertion, and not some other source of stress or preexisting condition, was the predominant and major cause of the heart-related or perivascular injury, illness, or death.
We have previously discussed the standard of "clear and convincing evidence" in Lannes v. Jefferson Door Co., 94-1 (La. App. 5 Cir. 5/11/94), 638 So.2d 250 as follows:
The new `clear and convincing evidence' standard..[in the 1989 revision to the compensation laws] is a heavier burden of proof than the usual civil case `preponderance of the evidence' standard, but is less burdensome than the `beyond a reasonable doubt' standard of a criminal prosecution. See, Bryant v. Giani Investment Co., 626 So.2d 390, 392 (La.App. 4th Cir.1993), and the cases cited therein. To prove a matter by clear and convincing evidence means to demonstrate that the existence of a disputed fact is highly probable, that is, much more probable than its nonexistence.
*529 Our standard of review in these cases has been reiterated by the Supreme Court in Smith v. Louisiana Dept. of Corrections 93-1305 (La. 2/28/94), 633 So.2d 129 is as follows:
In a worker's compensation case, as in other cases, the appellate court's review is governed by the manifest error or clearly wrong standard. Therefore, a factual finding cannot be set aside unless the appellate court finds that it is manifestly erroneous or clearly wrong. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the factfinder's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. [citations omitted].
We find the fact that all of the concrete finishers on this job were doing the same work at the same time is not determinative of this case. The statutory requirement that the stress be "extraordinary and unusual in comparison to the stress or exertion experienced by the average employee in the occupation" relates to the work actually being performed at the time of the injury or deaththat isthe test iswhether the "average" employee in cement finishing work would normally be engaged in that particular type or degree of work under the extremely hot and stressful conditions that Morris and his co-workers were working at 1:00 p.m. on June 16. If all of the other employees on this job were engaged in unusually stressful work at that time for that particular occupation, plaintiff could still recover under the statute.
The evidence in this case is clear that all of the cement finishers working that day, at that time, in that heat, were under extraordinary stress. All agreed that working during that time of the day in June was unusual, and that, usually and ordinarily, work would be done early in the morning at that time of the year. Work at that time (noon to one or two o'clock) was described as "real dangerous," a "bad time" of the day, and "rough." Craig Williams, who testified to the above, also became dizzy during the same period as decedent.
Considering the above testimony and observations, it is indisputable that working during the late morning hours to one o'clock in the intense heat caused unusual and extraordinary physical work stress in comparison to the ordinary stress that this type of work places on the "average" cement finisher. The fact that everybody did not have heart attacks does not ameliorate that fact. More than one person was substantially and visibly affected by the extraordinarily hot and stressful working conditions.
If an employer chooses to subject his workers to extraordinary, unusual and dangerous conditions in order to complete a job rather than stopping at a safe time as is usually done, then he must bear the consequences of what happens to his employees under the greater risk of harm arising from these dangerous and unusual conditions. Therefore, we hold that part one of the required burden of proof has been clearly met by clear and convincing proof.
With regard to the second portion of the statute, the Louisiana Supreme Court very recently discussed the issue of a pre-existing condition in Harold v. LaBelle Maison Apartments, 94-0889 (La. 10/17/94), 643 So.2d 752, thusly:
The defendant claims that Harold's claim must fail because Dr. Snyder stated that her heart attack `would have happened sooner or later anyway' (apparently because she had significant blockage in two major arteries as well as in side arteries), and that he could not definitively state why the heart attack happened when it happened. These factors are insufficient to defeat Harold's claim for worker's compensation benefits for several reasons. First, a heart attack claimant's case does not fail simply because the medical expert cannot definitively state what the primary cause of the heart attack was. Second, the defendant's argument is essentially that, because Harold had a previously unknown but undoubtedly existent heart disease, which prompted Dr. Snyder to conclude that her heart attack was inevitable, this condition must have been the primary [or predominant] cause of her heart attack, so she cannot recover. [This argument is *530 almost identical to the argument made here and to the testimony of Dr. Rehn].

We disagree [said the Supreme Court]. In our opinion, the legislature did not intend this result when it inserted the term `preexisting' in La.R.S. 23:1021(7)(e)(ii). To deny recovery to all heart attack claimants who have existent but unknown coronary artery disease would basically mean that no heart attack claimants would recover. Allowing the discovery of occluded arteries after the fact of a heart attack to preclude recovery of worker's compensation benefits is an overbroad reading of the statute. We do not think the legislature intended to eliminate all individuals with coronary artery disease from coverage of the worker's compensation laws. Instead, it made such claims more difficult to prove by adding the heightened requirements of La.R.S. 23:1021(7)(e). Statutes must be construed in a manner to effectuate their purpose. Smith v. Cajun Insulation, Inc., 392 So.2d 398, 400 (La.1980). In addition, it is well settled that worker's compensation laws must be given a liberal interpretation. Daigle v. Sherwin-Williams Co., 545 So.2d 1005, 1006 (La. 1989).
Applying these principles, we hold that La.R.S. 23:1021(7)(e) must not be construed to preclude recovery of worker's compensation benefits simply because the claimant suffers from previously unknown but undoubtedly existent coronary artery disease. As long as such a claimant meets the heightened burden of proof imposed by the amended statute, he or she can recover.
[Emphasis supplied].
Here, as in Harold, supra, the physician/witness called by defendant stated that the claimant would likely have had a heart attack at "some time" because of the previously existing condition. As we appreciate the testimony of Dr. Rehn and the autopsy report itself, it is not clear from the autopsy report whether Mr. Morris died of a clot due to the stenosis or because of an arrythymia brought on by the extreme heat conditions.
According to Dr. Rehn, the extra stress of working in the intense noontime heat likely caused hyperthermia which, in turn, led to fibrillation. Nevertheless in the present case (as in Harold), Dr. Rehn extrapolated that because a heart attack was inevitable at "some time," such disease was the "predominant" cause of the death, even while acknowledging that from the autopsy report he could not determine with certainty whether or not Mr. Morris experienced a fatal fibrillation caused by the heat. We emphasize that the only evidence upon which Dr. Rehn could possibly have based his opinion was the autopsy report and not on any examination of Mr. Morris's body. That is to say, he actually based his conclusionanother person's conclusionthat of the coroner's assistant who prepared the report. This is not very strong or convincing evidence.
The gist of Dr. Rehn's testimony is that he doesn't know why Mr. Morris had a heart attack, but because he had a pre-existing condition, such condition must have caused the death. As did the Supreme Court in Harold, and following the clear rules of interpretation of the applicable statute laid down in that case, we hold that the medical testimony here is not sufficient to defeat the worker's claim in this case. If Mr. Morris had died while sitting behind a desk in an air-conditioned office under no particular stress, the case would be much more difficult, if not impossible, to prove and, we would probably find otherwise under those circumstances. The fact that Mr. Morris died when performing extraordinarily hard labor in extraordinary and unusually dangerous heat, combined with the doctor's testimony that he would not have died at that time but for the heat, is sufficient to sustain the claimant's heightened burden of proof. As we view La.R.S. 23:1021, as interpreted in Harold, supra, by the Supreme Court, the purpose of the more stringent burden of proof is to prevent the fortuitous juxtaposition of a heart attack which happens to occur at the workplace, but which is mainly caused by non-work related factors. Such a situation is not present in this case.
Construing worker's compensation laws liberally, as is so firmly established in our jurisprudence and as we are bound to do (Harold, supra), we find that plaintiff did *531 prove by clear and convincing evidence that Mr. Morris suffered a fatal heart attack while performing strenuous work in intense heat (106 heat index), working in the afternoon of the hottest part of the day. We hold that these events and conditions are "extraordinary and unusual in comparison to the stress or exertion experienced by the average employee in that occupation," that such physical stress under these circumstances was the major and predominant cause of his death, and that the findings contrary to this by the hearing officer are manifestly erroneous. Therefore, plaintiff-appellant must prevail.

COMPENSATION
The claimant in the present case is Maudrey Johnson, mother of the deceased employee. It was stipulated at trial that Mr. Morris was in the course and scope of his employment at the time of his death. At the trial, Mr. Morris's sister, Marilyn Scott, testified that her brother resided with Mrs. Johnson, that he had never been married, and that he had no children. She further stated that Mr. Morris supported his mother financially. Mrs. Johnson was ill and unemployed, and did not receive medical or financial assistance. Funeral expenses in the amount of $3,800.00, and a bill for a headstone in the amount of $556.20 were paid by the family.
Mrs. Johnson herself testified that she had not worked since 1987, and that at the time of her son's death, she was wholly dependent on him. In her reasons for judgment, the hearing examiner was convinced that Mrs. Morris was financially dependent on the deceased, and we see no error in that statement. Nevertheless, because of the trial court's finding in favor of the employer, that finding was not reduced to judgment. We agree with the trial court's finding that Mrs. Morris was wholly dependent on her son and this finding should be reduced to judgment by the trial judge.
However, Mr. Morris' average weekly wage was not proven at trial. Because this issue was never reached in the lower tribunal, we remand the case for determination of the exact benefits, and the amounts thereof, due to claimant consistent with the views expressed in this opinion.

DECREE
For the foregoing reasons, the judgment appealed from is reversed and the matter is remanded to the Office of Worker's Compensation for further proceedings as delineated above and in keeping with this opinion. Costs are taxed to appellee.
REVERSED AND REMANDED.
NOTES
[1] La.C.E. art. 803(9) reads:

Art. 803. Hearsay exceptions; availability of declarant immaterial.
The following are not excluded by the hearsay rule, even though the declarant is available as a witness:
(9) Records of vital statistics. Records or data compilations, in any form, of birth, legitimation, adoption, or death, including fetal death, still birth, and abortion, or of marital status, including divorce and annulment, if the report thereof was made to a public office pursuant to requirements of law, and any record included within the Louisiana Vital Statistics Laws.
[2] La.R.S. 40:42 states in pertinent part:

A. Except for delayed or altered certificates, every original certificate on file in the vital records registry is prima facie evidence of the facts therein stated.