# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**05-0983**

**YURONDA JACKSON**

**VERSUS**

**CHRISTUS HEALTH CENTRAL LOUISIANA D/B/A CHRISTUS ST. FRANCES CABRINI HOSPITAL**

\*\*\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION, DISTRICT 2
PARISH OF RAPIDES, NO. 04-01063,
HONORABLE JAMES L. BRADDOCK
WORKERS' COMPENSATION JUDGE

\*\*\*\*\*\*\*\*\*\*\*\*

**JIMMIE C. PETERS
JUDGE**

\*\*\*\*\*\*\*\*\*\*\*\*

Court composed of Jimmie C. Peters, J. David Painter and James T. Genovese, Judges.

**AFFIRMED AS AMENDED.**

**Maria A. Losavio**
**Losavio Law Office, LLC**
**Post Office Box 12420**
**Alexandria, LA 71315-2420**
**(318) 767-9033**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
　　**Yuronda Jackson**

**Kathryn Fowler Van Hoof**
**Van Hoof Law Firm**
**Post Office Box 339**
**369 Lamourie Rd.**
**Lecompte, LA 71346**
**(318) 776-4836**
**COUNSEL FOR DEFENDANT/APPELLANT:**
　　**Christus Health Central Louisiana d/b/a Christus St. Frances Cabrini Hospital**

PETERS, J.

Christus Health Central Louisiana d/b/a Christus St. Frances Cabrini Hospital (Cabrini) has appealed a judgment which, among other things, awarded its former employee, Yuronda Jackson, workers' compensation medical benefits for her cervical injury, penalties, and attorney fees. Ms. Jackson has answered the appeal, seeking an increase in attorney fees for work done at the trial level as well as attorney fees for work done on appeal. For the following reasons, we affirm the judgment below in all respects and award Ms. Jackson an additional $2,500.00 in attorney fees for work done on appeal.

## DISCUSSION OF THE RECORD

On April 1, 2002, Ms. Jackson began working for Cabrini in its housekeeping department in Alexandria, Louisiana. On April 18, 2002, as Ms. Jackson was wiping underneath a bed, a wheel fell off of the bed and the bed fell on top of her. Ms. Jackson finished cleaning the room and then reported the incident to the housekeeping supervisor. An employee incident report was filed, which stated that the bed fell on Ms. Jackson's shoulder.[1]

On the same day as the accident, Ms. Jackson saw Dr. Ivan Altman and reported that she had "pain . . . all in her [right] shoulder." No complaints of cervical pain were noted. A shoulder X-ray was reported as being normal. Dr. Altman diagnosed Ms. Jackson as having a strained right shoulder and prescribed pain medication and a muscle relaxant. Dr. Altman saw Ms. Jackson thereafter and ultimately referred her to an orthopedist.

---

[1]There was some dispute as to whether the bed fell on Ms. Jackson's right shoulder or on her neck and right shoulder. The employee incident report, the employer's report of injury, and certain medical records provide that the bed fell on Ms. Jackson's shoulder, while other medical records provide that the bed fell on Ms. Jackson's neck. Ms. Jackson testified at trial that "the bed fell down on [her] neck onto [her] shoulder."

On April 29, 2002, Ms. Jackson saw Dr. L. Donovan Perdue, an orthopedist. At that time, Dr. Perdue reported, among other things, that Ms. Jackson had generalized tenderness about the shoulder and "mild discomfort with cervical compression," although no cervical diagnosis was made at that time. Instead, the doctor diagnosed Ms. Jackson as having a right shoulder strain. Ms. Jackson began a course of physical therapy the next day, during which she reported numbness in her arm, wrist, and hand and a "'tight' middle finger."

On September 3, 2002, Ms. Jackson went to Huey P. Long Medical Center (Huey P. Long). The Huey P. Long record provides Ms. Jackson's first documented specific complaint of neck pain. Ms. Jackson was prescribed medication and told to return if she experienced no improvement. Cabrini did not orchestrate the Huey P. Long visit—Ms. Jackson went of her own accord. She testified as follows regarding why she took this action: "I was waiting around for Cabrini to get in contact with me to send me to a doctor. I waited, waited, waited. No one called me. I was in so much pain."

Ms. Jackson did not return to Dr. Perdue until November of 2002, at which time she additionally began seeing Dr. Gordon L. Webb, also an orthopedist. On November 11, 2002, Dr. Perdue ordered diagnostic testing. On November 19, 2002, Ms. Jackson underwent an MRI of the cervical spine, which demonstrated degenerative disc disease and disc bulges at multiple levels. She also underwent an MRI of the right shoulder, which revealed mild subacromial bursitis.

By mid-December of 2002, both Dr. Perdue and Dr. Webb were of the opinion that Ms. Jackson's shoulder injury had healed and that Ms. Jackson's cervical

2

problem was not work related. Cabrini paid medical benefits for Ms. Jackson's shoulder injury but refused to recognize the cervical problem as being work related.

Ms. Jackson saw Dr. G. Andrew Wilson, a neurosurgeon, on March 12, 2003. At that time, the doctor diagnosed a possible cervical radiculopathy and recommended additional diagnostic testing. Apparently, Dr. Wilson moved his practice from the Alexandria area thereafter. Still, on August 15, 2003, he released a medical opinion in which he stated that the work accident "more probabl[y] than not caused her neck injuries and aggravated any preexisting neck condition." Nevertheless, Cabrini still did not recognize Ms. Jackson's cervical condition as being work related.

On February 13, 2004, Ms. Jackson filed the instant claim for compensation benefits, alleging, among other things, that no indemnity benefits had been paid and that medical treatment for her cervical injury was in dispute. Cabrini filed an answer, raising, among other issues, prescription. Subsequently, the parties entered into a consent order dismissing Ms. Jackson's claim for indemnity benefits. Cabrini then filed a formal exception of prescription as to medical benefits for the cervical injury.

In the meantime, Ms. Jackson went to the LSU Health Sciences Center in Shreveport (LSUS) on several occasions in connection with her cervical pain. She also began treating with another neurosurgeon, Dr. Patrick A. Juneau, III, on March 29, 2004. Dr. Juneau recommended diagnostic testing, and, on May 20, 2004, Ms. Jackson underwent another cervical MRI, which demonstrated "some progression of disease" but with "no associated significant new disc herniations." Dr. Juneau diagnosed Ms. Jackson as having cervical radiculomyelopathy. Ms. Jackson continued treating with Dr. Juneau, who concluded that Ms. Jackson needed cervical

surgery. Dr. Juneau also concluded that there was a causal link between Ms. Jackson's need for surgery and the work accident.

Cabrini continued to dispute causation and, on June 19, 2004, obtained an opinion from Dr. James A. Poche, apparently a neurosurgeon. Dr. Poche never saw Ms. Jackson but based his opinion on information provided to him. Dr. Poche agreed with the diagnosis of cervical disc disease and the recommendation of surgery, but he was of the opinion that the work accident did not cause Ms. Jackson's cervical problems.

Cabrini followed up with a second medical opinion on August 24, 2004, with Dr. Anil Nanda, a neurosurgeon. Dr. Nanda saw Ms. Jackson on one occasion only. He diagnosed Ms. Jackson as having C5-6 stenosis and recommended surgery if she "could not live around it." When presented with a questionnaire, Dr. Nanda indicated his agreement with Dr. Poche's opinion regarding lack of causation.

A hearing was held on November 16, 2004, in connection with the cervical injury. Following the hearing, Cabrini filed a "Motion to Report Fraud under La. R.S. 23:1208.2 and for Forfeiture of Benefits under La. R.S. 23:1208," alleging that Ms. Jackson committed fraud when she testified and submitted evidence regarding mileage reimbursements at the hearing. The workers' compensation judge (WCJ) signed a judgment on May 24, 2005,[2] denying Cabrini's motion; ordering Cabrini to pay for Ms. Jackson's cervical medical treatment "submitted at trial," including surgery; ordering Cabrini "to pay only for those mileage expenses submitted by [Ms. Jackson] as an exhibit at trial which were actually incurred by [Ms. Jackson]";

---

[2]This judgment was actually an amended judgment following a motion for new trial filed by Ms. Jackson regarding lack of conformity of the original judgment with the WCJ's oral reasons for judgment.

awarding Ms. Jackson $2,000.00 in penalties and $5,000.00 in attorney fees; and ordering Cabrini to pay costs of the proceedings.

Cabrini has appealed, contending that the WCJ erred in (1) crediting Ms. Jackson's testimony regarding the occurrence of a cervical injury and her request for mileage reimbursements, (2) finding that the cervical complaints were related to the work accident, (3) "awarding the payment of all medical bills submitted in evidence," (4) awarding penalties and attorney fees, (5) refusing to admit Ms. Jackson's deposition into evidence, and (6) failing to find that Ms. Jackson's claim for medical and mileage benefits had prescribed.

## OPINION

### *Credibility*

Cabrini contends that the WCJ "committed error in unreasonably evaluating the credibility of the claimant when the manifest weight of the evidence showed no degree of reliability and trust-worthiness in her testimony as to willful misrepresentation of mileage reimbursement or occurrence of cervical injury." In this assignment of error, Cabrini essentially urges that we overturn the WCJ's credibility evaluation of Ms. Jackson and also find that she forfeited her benefits pursuant to La.R.S. 23:1208 for misrepresenting her entitlement to mileage reimbursements.

Specifically, Cabrini attacks Ms. Jackson's credibility by pointing out "discrepancies" between Ms. Jackson's initial complaints of shoulder pain and subsequent complaints of cervical pain, between Ms. Jackson's description of the condition of the room following the collapse of the bed and her supervisor's description of the room, and between Ms. Jackson's description of which wheel fell off of the bed and her supervisor's description of which wheel fell off of the bed.

5

Cabrini does not contend that a work accident did not occur; rather, Cabrini contends that the work accident did not cause Ms. Jackson's cervical complaints. While there may have been discrepancies between Ms. Jackson's description and her supervisor's description as to the nature and extent of the aftermath of the work accident and while Ms. Jackson may not have initially reported cervical complaints, these "discrepancies" do not mandate overturning the WCJ's credibility determinations. Importantly, credibility calls are for the WCJ. *Bruno v. Harbert Int'l Inc.*, 593 So.2d 357 (La.1992). While another fact finder might have made different credibility determinations and weighed the evidence differently, we do not find that the WCJ was clearly wrong in rejecting Cabrini's attack on Ms. Jackson's credibility.

Cabrini also contends that Ms. Jackson wilfully made false statements for the purpose of obtaining workers' compensation benefits by misrepresenting her entitlement to mileage reimbursements at trial. Ms. Jackson introduced into evidence mileage claims for mileage which she testified she incurred, but the record reveals discrepancies in certain of Ms. Jackson's mileage claims. The mileage request forms Ms. Jackson submitted were signed and dated months after the mileage was allegedly incurred in several instances listed on the request forms. According to Ms. Jackson, she went over her records and appointment slips to compile her mileage claims. Louisiana Revised Statutes 23:1208 provides for the forfeiture of compensation benefits when a person wilfully makes a false statement or representation for the purpose of obtaining benefits. While there were inaccuracies, the WCJ was "convinced that Ms. Jackson did not wilfully and intentionally misrepresent her mileage trips." Essentially, there were two permissible views of the evidence, one being that Ms. Jackson merely became confused when she compiled her mileage

claims. Thus, we find no manifest error in the WCJ's determination that Ms. Jackson did not *wilfully* misrepresent her mileage.

### *Causation*

The WCJ found that Ms. Jackson's cervical injury was work related, and Cabrini challenges that finding. Cabrini does not dispute that Ms. Jackson has cervical problems. Rather, Cabrini contests the finding of causation by challenging Ms. Jackson's credibility, pointing out that she did not complain of neck pain until five months after the accident, and pointing to medical evidence that she had preexisting progressive cervical disc disease.

We have already found no manifest error regarding the WCJ's decision to reject Cabrini's attack on Ms. Jackson's credibility. Concerning the timing of Ms. Jackson's symptoms as an indication of lack of causation, Dr. Poche stated: "Cervical disc syndromes caused or aggravated by injury usually become symptomatic at the time of injury, or within the next 1-2 days. Occasionally, symptoms may develop only after 1-2 weeks." Ms. Jackson reported "pain . . . all in her [right] shoulder," an area obviously proximate to the cervical spine, as early as the day of the work accident. Dr. Webb stated that he and Dr. Perdue agreed "that the degenerative disc disease in her C-spine is the cause of her shoulder pain." Additionally, even Dr. Nanda was of the opinion that the pain generator was not in the shoulder joint but in the cervical spine. Thus, as early as the day of the work accident, Ms. Jackson manifested symptoms of a cervical problem through the shoulder pain, although not definitively diagnosed as such until months later. In any event, within two weeks of the work accident, Dr. Perdue recorded that Ms. Jackson had "mild discomfort with cervical compression." Also within two weeks of the work

7

accident, Ms. Jackson reported numbness in her arm, wrist, and hand. Again, while she did not obtain a specific diagnosis of a cervical injury within two weeks of the work accident, Ms. Jackson certainly presented with symptoms consistent with a cervical problem within that time frame. Moreover, while it was not until several months after the work accident that the emphasis of Ms. Jackson's complaints shifted to cervical pain specifically and a definitive diagnosis was made, both of Ms. Jackson's treating neurologists, Dr. Wilson and Dr. Juneau, were of the opinion that Ms. Jackson's cervical injury was caused by the work accident.

Nevertheless, Cabrini points to medical evidence to the effect that Ms. Jackson's cervical problems preexisted the work accident. Concerning Ms. Jackson's preexisting degenerative process, Dr. Poche stated: "There are numerous signs of degenerative disc disease noted in the cervical MRI which pre-date the injury; therefore, it is not necessary to postulate an event or injury in order for symptoms to develop." Dr. Nanda indicated agreement with Dr. Poche's opinion in that regard. Further, Dr. Webb stated that he and Dr. Perdue were in agreement that Ms. Jackson's "degenerative disc disease in her C-spine . . . could not have been the result of her injury on April 18, 2002."

However, "[e]ven if there were a pre-existing latent back disability, nevertheless workmen's compensation benefits are payable when a work-accident aggravates or accelerates it, producing disability. 'A claimant's disability is presumed to have resulted from an accident, if before the accident the injured person was in good health, but commencing with the accident the symptoms of the disabling condition appear and continuously manifest themselves afterwards, providing that the medical evidence shows there to be a reasonable possibility of causal connection

8

between the accident and the disabling condition.' *Lucas v. Insurance Company of North America*, 342 So.2d 591, 596 (La.1977)." *West v. Bayou Vista Manor, Inc.*, 371 So.2d 1146, 1149 (La.1979) (citation omitted).

In fact, while Dr. Perdue did initially report that Ms. Jackson's cervical problem was the result of "degenerative process, not caused by injury," he subsequently explained that degenerative disc disease "can easily be aggravated by incidents, such as her work injury . . . ." Ms. Jackson does not contend that the work accident caused her degenerative process. Rather, she became symptomatic following the work accident. Ms. Jackson presented evidence to show that she was in good health before the work accident and that she became symptomatic shortly after the work accident. She also presented medical evidence showing more than a reasonable possibility of a causal connection. Cabrini presented no evidence to suggest that Ms. Jackson had any cervical symptoms before the accident or that an intervening activity or accident caused Ms. Jackson's cervical injury. Therefore, we find no manifest error in the WCJ's finding of causation.

### *Medical Bills*

In the amended judgment, the WCJ ordered Cabrini to "pay for the cervical medical treatment, including surgery, of [Ms. Jackson] submitted at trial." Cabrini contends that the WCJ erroneously "awarded payment of all medical bills submitted in the present case." Specifically, Cabrini challenges the following bills: (1) LSUS bills totaling $2,747.40, (2) a Rite Aid Pharmacy bill in the amount of $20.89, (3) an Eckerd Pharmacy bill in the amount of $7.88, (4) a medical mileage claim totaling $413.44, (5) a medical mileage claim totaling $47.64, and (6) an "LSU lien."

9

Cabrini argues that "[t]here is no medical record supporting the [LSUS] bills except for the March 4, 2004 outpatient record . . . which refers only to un-related back and neck pain." Cabrini also disputes an "LSU lien" that it contends is erroneously marked as Defendant's Exhibit 22. Ms. Jackson submits that the "LSU lien" to which Cabrini refers is actually in evidence as Plaintiff's Exhibit 1, for which she claims the $2,747.40. Cabrini does not challenge the authenticity of these medical bills, and they correspond with the nature and timing of Ms. Jackson's cervical complaints. Further, as set forth above, we have affirmed that Ms. Jackson's cervical injury was work related. Thus, we reject Cabrini's argument regarding the LSUS bills.

Cabrini challenges the $20.89 Rite Aid Pharmacy bill because it "neither identifies the prescriptions filled, the ordering physician, or in any way describes how it could be work-related." The prescription was filled on April 14, 2003, for cyclobenzaprine, which is the generic of Flexeril, a muscle relaxant. Dr. Altman prescribed a muscle relaxant for Ms. Jackson as early as the day of the accident, and Ms. Jackson was prescribed Flexeril in connection with an emergency room visit in February 2003 for shoulder pain. Furthermore, Ms. Jackson testified that the prescription was for her shoulder and neck. The record contains no evidence to show that Ms. Jackson had another incident or injury that would have necessitated treatment with a muscle relaxant. Accordingly, we reject Cabrini's argument regarding the Rite Aid Pharmacy bill.

Additionally, Cabrini challenges the $7.88 Eckerd Pharmacy bill on the basis that it "is supported by no medical record indicating how it could be work-related." This prescription was filled on February 6, 2003, for codeine, a pain reliever. The

record reveals that Ms. Jackson went to the emergency room on that day and was diagnosed with shoulder pain and prescribed pain medication. Ms. Jackson testified that the prescription was for her shoulder and neck, and the record contains no evidence to show that Ms. Jackson had another incident or injury that would have necessitated treatment with a pain reliever. Therefore, we also reject Cabrini's argument regarding the Eckerd Pharmacy bill.

Cabrini challenges two medical mileage reimbursement claims, but Ms. Jackson concedes in her appellate brief that the WCJ "specifically ruled that defendant was only responsible for those mileage expenses actually incurred, not all the mileages submitted in Plaintiff's Exhibits 4 and 5." Thus, we reject Cabrini's argument in this regard.

### Penalties and Attorney Fees

The WCJ awarded penalties in the amount of $2,000.00 and attorney fees in the amount of $5,000.00 in connection with Cabrini's denial of medical benefits for Ms. Jackson's cervical condition. The WCJ based its award "on the totality of the evidence and the very minimal inconsistencies and the equivocal statements of the physicians relied upon by the employer."

"[T]o determine whether the claimant's right has been reasonably controverted, thereby precluding the imposition of penalties and attorney fees under La. R.S. 23:1201, a court must ascertain whether the employer or his insurer . . . possessed factual and/or medical information to reasonably counter the factual and medical information presented by the claimant throughout the time he refused to pay all or part of the benefits allegedly owed." *Brown v. Texas-LA Cartage, Inc.*, 98-1063, p. 9 (La. 12/1/98), 721 So.2d 885, 890. We review a WCJ's decision regarding the

11

assessment of penalties and attorney fees pursuant to the manifest error standard. *Olivier v. After Crash, Inc.*, 04-1655 (La.App. 3 Cir. 5/4/05), 901 So.2d 1214.

Cabrini contends that the WCJ erred in awarding penalties and attorney fees. As we appreciate Cabrini's position, it reasonably controverted the claim based on the timing of Ms. Jackson's cervical complaints and the opinions of Dr. Webb, Dr. Perdue, Dr. Poche, and Dr. Nanda that Ms. Jackson's cervical injury was not caused by the work accident.

As set forth above, early on Dr. Webb and Dr. Perdue were of the opinion that Ms. Jackson had degenerative disc disease that was not caused by her work accident. However, later on in response to Dr. Wilson's opinion regarding causation, Dr. Perdue expounded on his original opinion in part as follows:

> Please be advised that this review [of Dr. Wilson's statement dated August 15, 2003] does not change my opinion. Undoubtedly, the degenerative disc disease at multiple levels in her cervical spine as demonstrated by MRI as well as osteophytes constitute a chronic condition which long preceded her work injury. *Of course this kind of condition can easily be aggravated by incidents, such as her work injury*, as well as activities of daily living, as well as flare-ups occurring for no particular reason.
>     . . . .
> The question of whether or not her work injury aggravated the condition and rendered it symptomatic cannot be answered definitively, but the best indication of that would be careful review of her prior medical records from all sources prior to her work injury . . . . If review of her records shows that she had similar symptoms prior to her work injury, then I would not consider her work injury as being a significant cause and aggravation of her pre-existing condition. *If a review of her record does not show any history of similar symptoms prior to her work injury, then I would consider her work injury to have aggravated her pre-existing condition.*

(Emphasis added.)

Importantly, Cabrini never obtained information to suggest that Ms. Jackson had any cervical symptoms before the accident. Thus, although Dr. Webb's and Dr. Perdue's

initial opinions may have provided an initial basis for Cabrini to deny benefits, Dr. Perdue's subsequent opinion actually supported Ms. Jackson's claim for benefits. Further, although Dr. Webb's initial opinion remained unchanged, it did not provide a reasonable basis for the denial of benefits because it did not address the issue of causation of any aggravation or acceleration of Ms. Jackson's preexisting cervical condition.

Dr. Poche, who never examined Ms. Jackson, was of the opinion that the work accident did not cause Ms. Jackson's disc to rupture or become symptomatic. He predicated his conclusion on the following:

1. The original injury was to the shoulder.
2. The original evaluations note point tenderness in the shoulder. This implies the pain generator was in the shoulder joint or its surrounding soft tissues. This pain did not originate in the cervical spine.
3. Cervical disc syndromes caused or aggravated by injury usually become symptomatic at the time of injury, or within the next 1-2 days. Occasionally, symptoms may develop only after 1-2 weeks. In this particular case, the period of time that passed between the injury and the onset of definable cervical disc symptoms would make a causal relationship very doubtful.
4. There are numerous signs of degenerative disc disease noted in the cervical MRI which pre-date the injury; therefore it is not necessary to postulate an event or injury in order for symptoms to develop.

Dr. Poche's determination that the pain generator was in the shoulder and not the cervical spine is in direct conflict with the determinations of the other physicians upon which Cabrini relied, Dr. Webb, Dr. Perdue, and Dr. Nanda, who concluded that the pain generator was in fact in the cervical spine. Moreover, contrary to Dr. Poche's supposition, Ms. Jackson actually began exhibiting cervical symptoms immediately following the accident, although not immediately diagnosed as such. Furthermore, Dr. Poche's analysis regarding Ms. Jackson's preexisting cervical disc

disease does not take into consideration that Louisiana Workers' Compensation Law provides for recovery even for an aggravation or acceleration of an employee's preexisting condition and additionally provides an employee with a presumption of causation under circumstances such as are present in the instant case. Finally, this court has held that the mere production of a different opinion of a physician who never examined the employee does not constitute competent medical evidence sufficient to reasonably controvert a claim for benefits. *LeMelle v. Wal-Mart Stores, Inc.*, 04-527 (La.App. 3 Cir. 9/29/04), 883 So.2d 526. Thus, Dr. Poche's opinion did not provide an acceptable basis for Cabrini to deny benefits for Ms. Jackson's cervical injury.

Cabrini also relied on the opinion of Dr. Nanda, who did see Ms. Jackson, but on only one occasion for a second medical opinion. Moreover, he merely checked the "Yes" boxes on a questionnaire to indicate his agreement with Dr. Poche that "cervical disc syndromes caused or aggravated by injury usually become symptomatic at the time of injury or within 1-2 days, and occasionally as late as 1-2 weeks" and that it was "not necessary to postulate an event or injury in order for symptoms to develop" in light of the signs of the degenerative disc disease. He also checked the "Yes" box to indicate his agreement that "the amount of time that passed between the date of injury (4/18/02) and the onset of definable cervical disc symptoms (11/11/02) would make a causal relationship very doubtful." As did Dr. Poche, Dr. Nanda relied on assumptions not supported by the evidence or law. Thus, Dr. Nanda's opinion did not provide an acceptable basis for Cabrini to deny benefits in light of all of the information available to Cabrini by the time of Dr. Nanda's analysis. Importantly, both of Ms. Jackson's treating neurologists, Dr. Wilson and Dr. Juneau,

were of the opinion that Ms. Jackson's cervical injury was caused by the work accident. Cabrini apparently questioned Dr. Wilson's opinion because he couched it in terms of the bed having fallen on Ms. Jackson's head rather than on her shoulder. However, Cabrini did not obtain information to show that Dr. Wilson's opinion regarding causation was unsupportable because of his understanding of the location of the point of impact. Thus, Cabrini was not entitled to automatically discount Dr. Wilson's opinion, particularly in light of Dr. Juneau's opinion. Interestingly, Cabrini relied on Dr. Nanda's opinion, although he described the mechanism of injury as being a "[fall] off a bed."

Basically, while Cabrini did possess medical information early on to support a lack of causation, the information Cabrini possessed was insufficient to *reasonably* counter the factual and medical information presented by Ms. Jackson *throughout* the time Cabrini refused to pay benefits. Thus, the WCJ was not manifestly erroneous in awarding Ms. Jackson penalties and attorney fees.

### *Exclusion of Deposition*

At trial, Cabrini sought to introduce into evidence Ms. Jackson's deposition. The WCJ refused to admit the deposition into evidence for purposes other than impeachment, and Cabrini contends that this was error. "However, if a party fails to proffer excluded evidence, an appellate court cannot analyze it and its admissibility, and that party is precluded from complaining of the excluded testimony." *Whitehead v. Kan. City S. Ry. Co.*, 99-896, p. 11 (La.App. 3 Cir. 12/22/99), 758 So.2d 211, 218-19, *writ denied*, 00-209 (La. 4/7/00), 759 So.2d 767. Because Cabrini did not proffer the deposition, it is precluded from complaining about the WCJ's refusal to admit the deposition into evidence.

***Prescription***

Finally, while Cabrini concedes that "[t]here is no dispute that the claim for medical payments for the alleged shoulder injury has not prescribed," Cabrini nevertheless contends that any claim for medical and mileage reimbursement benefits regarding Ms. Jackson's cervical condition has prescribed. Specifically, Cabrini argues that Ms. Jackson's claim regarding her cervical condition has prescribed because Ms. Jackson "has received no workers' compensation medical payments for cervical injuries and she has not asserted her claim for medical benefits for cervical injuries with the Office [of] Workers' Compensation within one year of the accident, or within one year of the date the cervical injuries developed."

Louisiana Revised Statutes 23:1209(C) provides:

> All claims for medical benefits payable pursuant to R.S. 23:1203 shall be forever barred unless within one year after the accident or death the parties have agreed upon the payments to be made under this Chapter, or unless within one year after the accident a formal claim has been filed with the office as provided in this Chapter. *Where such payments have been made in any case, this limitation shall not take effect until the expiration of three years from the time of making the last payment of medical benefits.*

(Emphasis added.)

Without discussing the effect of Cabrini's payment of medical benefits for Ms. Jackson's shoulder injury, we note that, despite Cabrini's assertion to the contrary, the evidence reveals that Cabrini did in fact pay for diagnostic testing in connection with Ms. Jackson's cervical injury in November of 2002 and that Ms. Jackson filed her claim for medical benefits in connection with the cervical injury well within three years of Cabrini's payment for the diagnostic testing. Cabrini also paid for diagnostic testing for the cervical spine as late as May of 2004. Accordingly, Ms. Jackson's claim for medical benefits for her cervical injury has not prescribed.

### *Answer to Appeal*

Ms. Jackson has answered the appeal, seeking an increase in attorney fees for work done at the trial level as well as attorney fees for work done on appeal. "[T]he amount of the statutory attorney fees rests within the discretion of the WCJ, provided the amount is supported by the record." *LeMelle*, 883 So.2d at 534. We find no abuse of discretion in the amount of attorney fees the WCJ awarded at the trial level. However, we do find that attorney fees are warranted for work done on appeal, and we award $2,500.00 in that regard.

## DISPOSITION

For the foregoing reasons, we affirm the judgment below in all respects and award additional attorney fees in the amount of $2,500.00 for work done on appeal. We assess costs of this appeal to Christus Health Central Louisiana d/b/a Christus St. Frances Cabrini Hospital.

**AFFIRMED AS AMENDED.**