# STATE OF LOUISIANA
# COURT OF APPEAL, THIRD CIRCUIT

## 06-100

**LINDA HUNTER**

**VERSUS**

**ALLIANCE COMPRESSORS**

**********

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION - # 2
PARISH OF RAPIDES, NO. 03-03298
JAMES L. BRADDOCK, WORKERS' COMPENSATION JUDGE

**********

**ULYSSES GENE THIBODEAUX**
**CHIEF JUDGE**

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Marc T. Amy, and Michael G. Sullivan, Judges.

**AFFIRMED**.

**George Arthur Flournoy**
**Flournoy & Doggett**
**P. O. Box 1270**
**Alexandria, LA 71309**
**Telephone:  (318) 487-9858**
**COUNSEL FOR:**
    **Plaintiff/Appellee - Linda Hunter**

**Mark Alan Watson**
**Stafford, Stewart, & Potter**
**P. O. Box 1711**
**Alexandria, LA 71309**
**Telephone:  (318) 487-4910**
**COUNSEL FOR:**
    **Defendant/Appellant - Alliance Compressors**

THIBODEAUX, Chief Judge.

Defendant-appellant, Alliance Compressors, Inc. (Alliance), seeks a reversal of the portion of the Office of Workers' Compensation (OWC) judgment which granted to the plaintiff-appellee, Linda Hunter (Ms. Hunter), supplemental earnings benefits and penalties for Alliance's failure to tender those benefits. Alliance also appeals the award to Ms. Hunter of medical benefits for the evaluation and treatment of her cervical injuries by Drs. Carl Goodman and Marco Ramos, as well as the assessment of penalties for Alliance's failure to initially authorize the medical evaluations and treatment. Ms. Hunter has answered the appeal, seeking a reversal of the OWC's denial of her request for reimbursement of her mental health treatment expenses. She also seeks a reversal of the court's denial of her claim for penalties for Alliance's alleged late payment of a medical bill. Finally, she seeks additional attorney fees for the work performed by her attorney on this appeal.

For the following reasons, the judgment of the OWC is affirmed. Ms. Hunter is granted additional attorney fees in the amount of $2,500.00 for work performed on this appeal.

I.

## ISSUES

### Alliance's Issues

1. Did Ms. Hunter opt for a voluntary lay-off, thus making her ineligible for supplemental earnings benefits during the lay-off period?

2. Did the OWC err in assessing penalties to Alliance for its failure to pay Ms. Hunter any supplemental earnings benefits during the lay-off period?

3. Did Ms. Hunter sufficiently establish that her cervical injury was caused by her work accident?

4.      Was it erroneous to assess penalties to Alliance for its initial failure to authorize evaluation and treatment for the cervical injury?

### *Ms. Hunter's Issues*

1.      Did the OWC err in failing to order the payment for mental health treatment rendered by clinical psychologist, Dr. Ben Arnold?

2.      Did the OWC err in failing to assess a penalty to Alliance for the alleged late payment of Dr. Sandifer's December 16, 2002 bill?

3.      Is Ms. Hunter entitled to an additional award of attorney fees for this appeal?


## II.

## FACTUAL BACKGROUND

Plaintiff-appellee, Ms. Hunter, was employed at Alliance Compressors as a full-time employee. She worked the weekend shift, which consisted of Fridays, Saturdays and Sundays. Ms. Hunter was employed in the assembly department, performing general labor, assembly-line work. It is undisputed that she suffered a job-related injury on November 30, 2002, during the process of attempting to remove a pin stuck in a machine she was using. Ms. Hunter was jerked when the machine unexpectedly moved, injuring her left shoulder and arm, as well as her neck. When she was jerked by the machine, she also stated that she heard her shoulder "pop."

The particular injuries caused by the accident soon became the subject of a dispute. Ms. Hunter initially sought workers' compensation benefits from her employer on May 5, 2003; however, they were denied. In that disputed claim, she stated that her left arm and shoulder were injured. The claim was amended on November 4, 2004, to reflect injuries to the following parts of the body: left shoulder, left arm, left hand, and neck.

*Medical Treatment and the Onset of Symptoms*

The Alliance accident report, completed on the day of the accident, describes Ms. Hunter's complaint as "shoulder pain." The company's first responder report, which was also completed on the day of the accident, states, "[w]ears wrist brace from previous injury. Feels burning in wrist radiating up to shoulder. Can't raise left arm without pain."[1] She received medical treatment that day at the Natchitoches Parish Hospital Emergency Room. The patient registration form states the reason for the visit as "pain in left shoulder and wrist." After an x-ray was taken, the clinical impression resulting from that visit was left shoulder pain, left wrist pain, and a contusion on the left middle finger. Ms. Hunter was discharged home with a prescription for anti-inflammatory and pain medication, a two-day work excuse, and directions to return if the conditions worsened.

Ms. Hunter returned to work two days later on December 2, 2002. Over the course of the following months, she sought treatment with several physicians to address her continued complaints of left arm and shoulder pain, right shoulder pain, pain in both wrists, and eventually, for the onset of swelling and pain in the neck area.

On December 3, 2002, Ms. Hunter sought treatment from internist, Dr. Mary Long, her primary care physician. She was initially evaluated for pain in the left shoulder and both wrists. Dr. Long diagnosed carpal tunnel syndrome, prescribed anti-inflammatory medication, ordered an electromyography (EMG), and recommended that she be placed on a "desk duty restriction" at work.

Alliance re-assigned Ms. Hunter to a light-duty job referred to as "bolts and sleeves," which was a sedentary position that required her to slide .08-ounce bolts into one-ounce, metal sleeves. She assembled one bolt and sleeve at a time, piling up

---

[1]The record reflects that Ms. Hunter reported a previous on-the-job injury to her left wrist on September 13, 2002, which caused pain and swelling.

the assembled pieces in boxes at her work station. The record reflects that she was not required to lift any of the boxes of the unassembled pieces or the completed pieces or do any lifting beyond her restrictions.

On December 5, 2002, Ms. Hunter underwent the EMG ordered by Dr. Long. It was conducted by Dr. Stephen Wheat, an internal medicine physician who also specializes in physical medicine and rehabilitation. Ms. Hunter complained to him of bilateral shoulder pain and pain in both of her wrists. The EMG did not reveal any positive findings in either of the bilateral, upper extremities. Dr. Wheat then ordered an MRI, which revealed a partial tear in the left shoulder rotator cuff. Ultimately, he diagnosed rotator cuff disease, bilateral carpal tunnel syndrome, and bilateral lower extremity parasthesias, i.e., numbness and tingling.[2]

As a result of these results and Ms. Hunter's continued complaints of bilateral shoulder and wrist pain, Dr. Long, during her follow-up evaluation on December 12, 2002, referred Ms. Hunter to orthopedic surgeon, Dr. John Sandifer. Also, in her second report to Alliance of this examination of Ms. Hunter, Dr. Long extended her recommendation for "desk duty work."

On December 16, 2002, Ms. Hunter met with Dr. Sandifer for her initial orthopedic evaluation. He also diagnosed bilateral carpal tunnel syndrome but concluded that she was suffering from a strain with tendonitis in the left shoulder. He provided left shoulder and left wrist cortisone injections and recommended a "very light duty" work restriction with a "very limited use of the left upper extremity." He also ordered a three-week follow-up appointment. This information was provided to Alliance as well.

---

[2]There is no other mention in the record of Ms. Hunter experiencing these symptoms in the lower extremities after her evaluation by Dr. Wheat.

### *The Commencement of the Neck Complaints*

Prior to her three-week follow-up visit with Dr. Sandifer, Ms. Hunter had two follow-up exams with Dr. Long. On December 19, 2002, Dr. Long noted no improvement in Ms. Hunter's condition. On December 23, 2002, which was approximately three weeks after the accident, Ms. Hunter returned to Dr. Long, and for the first time added swelling around the neck to her list of complaints. She advised Dr. Long that the swelling began while she was at work during the immediately preceding weekend. Dr. Long conservatively treated Ms. Hunter with medication in response to these complaints. She was not evaluated by Dr. Long for her shoulder, wrist or neck problems again until March 2004.

Ms. Hunter, instead, continued her treatment with Dr. Sandifer. His report of his next follow-up evaluation with Ms. Hunter on December 30, 2002, however, did not contain any mention or observation of complaints of neck pain or swelling. His records show that the only change in her condition was a subsidence in the numbness in her left wrist. Dr. Sandifer, accordingly, prescribed three weeks of physical therapy, three times per week. He also provided specific work restrictions of no overhead lifting with the left arm. He restricted shoulder-level lifting to two pounds, and advised against any repetitive pushing or pulling or repetitive wrist flexion/extension activities. A three-week follow-up evaluation was scheduled.

Notably, the record reflects that on January 11, 2003, a few days prior to returning for her scheduled follow-up visit with Dr. Sandifer, Ms. Hunter sought out medical treatment at work for neck pain and swelling, along with right wrist and shoulder pain. While performing bolts and sleeves assembly work, she reported experiencing a sharp pain in her wrist, shoulder, and neck after opening a box of sleeves and attempting to remove a bag of sleeves from the box.

Dr. Sandifer's record of the January 13, 2003, follow-up visit reflects, for the first time, noticeable swelling on the right side of Ms. Hunter's neck and right trapezius muscle area. He also noted that she stated that the swelling became apparent while assembling bolts and sleeves at work. This time, he prescribed physical therapy treatment to focus on the areas of inflammation, ordered her to continue taking her prescribed medications, and recommended that she continue to abide by the light-duty work restrictions.

Dr. Sandifer's next report of his January 27, 2003, evaluation of Ms. Hunter noted that she reported significant improvement in the left shoulder as a result of the focused physical therapy; however, he wrote that she still complained of increased swelling in the right trapezius muscle area. During her next follow-up visits with Dr. Sandifer on February 17, 2003 and March 17, 2003, Ms. Hunter's symptoms remained the same.

After the March 17, 2003, office visit, Dr. Sandifer provided Alliance with approval for Ms. Hunter's movement from the bolts and sleeves job to another assembly job—the orbit form job—which he described as being "very, light duty." Despite the fact that Ms. Hunter was scheduled for a six-week follow up examination, she returned the following week, on March 24, 2003, complaining about his approval of the orbit form job. Although he maintained his approval of the suitability of the job for her, he reiterated in his report that this placement should take place on a trial basis.

On April 7, 2003, Dr. Sandifer again noted continued swelling in Ms. Hunter's shoulder areas and the area of the trapezius muscle. The bilateral carpal tunnel syndrome was also unresolved. Ms. Hunter's prescribed medications were continued, but this time, her job restrictions were increased to include no overhead lifting at all, a limitation of five pounds of shoulder-level lifting, and no repetitive

pushing or pulling of more than five pounds. He also stated that she could not perform any repetitive wrist flexion/extension activities because of the carpal tunnel syndrome. This job restriction change was reported to Alliance. Ms. Hunter was not evaluated again by Dr. Sandifer until June 6, 2003.

During this gap in treatment with Dr. Sandifer, Ms. Hunter began treating with another orthopedic surgeon, Dr. Baer Rambach. At her first appointment with him on April 10, 2003, she listed her chief complaints as pain and swelling in the left wrist, left shoulder, back of neck and right shoulder. She complained to him of the recent job placement change at Alliance from bolts and sleeves assembly to orbit form assembly, which she described as being more repetitious and causing even more irritation to her neck, shoulders and upper extremities than the bolts and sleeves assembly job.

After an examination, Dr. Rambach diagnosed a rotator cuff tear, which he stated might require surgical repair. The tear, he opined, was secondary to trauma. He also stated that the left shoulder symptoms were likely associated with impingement syndrome and a probable unstable acromioclavicular (AC) joint of the left shoulder girdle, as well as tendonitis. In addition, he diagnosed bilateral carpal tunnel syndrome, finding it worse in the left wrist than the right. He regarded the neck injury as myoligamentous and myofascial sprains and strains to the cervical spine area. He stated that he did not detect any mechanical nerve root compression signs indicative of a herniated intervertebral disc in the cervical spine area. He also recommended that Ms. Hunter be placed back on her previous job assembling bolts and sleeves due to the increased aggravation the orbit form job appeared to be causing her.

During the next follow-up appointment on May 1, 2003, Dr. Rambach found no change in Ms. Hunter's status. He felt that surgical intervention was not yet

7

needed, recommended another round of physical therapy, and again recommended that Ms. Hunter remain on the bolts and sleeves job at Alliance. A two-month follow-up appointment was scheduled.

### *The Lay-Off*

In the meantime, Ms. Hunter was laid-off from Alliance. According to the record, Alliance underwent a seasonal shutdown of its weekend assembly shift on May 25, 2003, with a pre-scheduled, tentative restart date. Alliance's records reflect that Ms. Hunter opted for the voluntary lay-off that was offered to all of the full-time, weekend-shift employees. She received unemployment benefits during the lay-off period, beginning the week ending July 5, 2003.

During this lay-off period, Ms. Hunter continued to be regularly evaluated for her complaints. Although she did not work during her period of being laid-off, her symptoms never steadily improved. As of May 25th, approximately six months after the accident, she still showed no significant or steady improvement. Her next visit with Dr. Sandifer on June 6, 2003, reflected this as well as her next July 14, 2003, appointment with Dr. Rambach. July 14, 2003 was the date of Dr. Rambach's last evaluation of Ms. Hunter, due to his impending retirement; however, as a result of that evaluation, he concluded that Ms. Hunter had reached an impasse and was not medically improving, and recommended that she seek specialty treatment and evaluation with a colleague in his medical group who specialized in diseases and injuries of the shoulder. In his report, he opined that arthroscopic evaluation and treatment of the left shoulder would be needed to achieve any improvement in that condition.

Ms. Hunter complained of muscle spasms in the area of the right side of her neck and bilateral wrist pain during her visit to Dr. Sandifer on July 16, 2003.

Her medications were adjusted in response. In his subsequent evaluation of Ms. Hunter on August 26, 2003, Dr. Sandifer saw some improvement in the carpal tunnel syndrome, but none in the left shoulder; her complaints were otherwise the same. He maintained that surgical intervention for the shoulder was not definitively needed at that time, and again advised Ms. Hunter to continue her medications and to follow-up with him in six weeks. That follow-up appointment occurred on November 18, 2003, and resulted in findings of continued, unresolved bilateral shoulder problems, swelling on the left side of the neck, and carpal tunnel syndrome. Because there was no improvement in her condition during this time away from work, Dr. Sandifer noted in his office report his awareness of her approaching deadline to return to work. He consequently reported that, upon returning to work, she should be placed on very light-duty work activities that would mainly require use of her right arm. Again, he stated that she was not a good candidate for surgery.

When Ms. Hunter was recalled by Alliance, approximately six months had passed since the shutdown of her work shift and a year had passed since the accident. She reported back to work on December 12, 2003. She was reinstated to her full-time position in the assembly department, assembling bolts and sleeves. Her medical condition remained unimproved, according to January 7, 2004 and February 11, 2004 reports by Dr. Sandifer.[3]

### Complaints of Depression

Ms. Hunter consulted with a counseling psychologist, Dr. Ben Arnold, to address her complaints of depression. She met with Dr. Arnold only two times: March 9, 2004 and April 6, 2004. She failed to appear for her appointment on May

---

[3]Ms. Hunter was seen once, on February 27, 2004, by a third orthopedic surgeon, Dr. Steven Atchison. He recorded her complaints of bilateral shoulder pain and bilateral carpal tunnel syndrome, diagnosed a left shoulder, rotator cuff tear, and recommended an updated MRI and EMG of the left shoulder. The record does not reflect that Ms. Hunter underwent those additional scans.

4, 2004. His brief records consist, in relevant part, of Ms. Hunter's recounting of her work accident and her history of medical treatment since the accident. She also talked with him about her perceived physical limitations, which, she stated, had negatively affected her home and social life. She attributed two separations from her husband to her injuries, and stated that she felt isolated, irritated, helpless, suffered sleep problems, and had resumed smoking and drinking, after a seven-year period of not doing so. Dr. Arnold's records do not expressly reflect that he ever rendered a diagnosis, but do contain his notes regarding providing her with information on relaxation techniques that he wanted her to utilize. This, along with the "talk therapy," as recorded in his records, was the extent of his treatment of Ms. Hunter.

During this time, Ms. Hunter was also receiving treatment from Dr. Long for her complaints of depression. Specifically, Dr. Long's March 1, 2004, notes state that although there was no change in Ms. Hunter's prior physical complaints, she also appeared for the visit, seeking treatment for stress, anxiety and depression. Dr. Long prescribed Lexapro, an anti-anxiety/anti-depressant medication. During that visit, Dr. Long also adjusted her pain and anti-inflammatory medications and scheduled an MRI of Ms. Hunter's neck. Regarding work restrictions, she advised Ms. Hunter to continue with her current light-duty job placement.

### The Cervical Spine Findings

The MRI of the cervical spine was taken on March 4, 2004, and showed a moderate disc herniation at C5-6, with significant nerve impingement and minimal disc protrusion noted at C4-5. After receiving these results, Dr. Long referred Ms. Hunter to orthopedic surgeon, Dr. Carl Goodman, who specializes in spinal injuries and diseases. However, treatment by Dr. Goodman was never approved by Alliance. Alliance rejected the contention that the cervical injury was related to the November

10

2002 work accident. On March 12, 2004, based upon the findings of the MRI report, Ms. Hunter was advised by human resource personnel at Alliance to take a leave from work due to her condition. She was told to apply for Family and Medical Leave benefits and short-term disability benefits. Ms. Hunter was ultimately denied those benefits because of her failure to submit the necessary paperwork within the deadline required.

Ms. Hunter continued to see Dr. Sandifer. He was provided with the MRI report. In his report of their March 24, 2004, office visit, he again noted his uncertainty of her candidacy for any type of surgery. He advocated the continued conservative medical treatment, but stated that a worsening of her symptoms would justify a neurosurgery consultation. He also concluded that Ms. Hunter could not return to her current employment at Alliance because of her condition.

Although she was no longer working, Ms. Hunter continued to experience swelling around the neck and in the trapezius muscle, coupled with pain. As of April 13, 2004, Dr. Sandifer continued to doubt Ms. Hunter's suitability for surgery, and restarted shoulder injections to treat her symptoms. She returned to him on May 21, 2004, with "a lot of swelling around her neck," according to his notes, with pain radiating down into her right arm and tingling in the right wrist. Dr. Sandifer, noting the possibility of a herniated disc on the left side, referred her to neurosurgeon, Dr. Marco Ramos.

Dr. Ramos evaluated Ms. Hunter on June 28, 2004, and diagnosed manifestations of cervical radiculopathy at C5-6 and C6-7, based on the March 5, 2004, MRI of the cervical spine and his examination of Ms. Hunter. He recommended a microdiscectomy at C5-6 and C6-7, and a C6 corpectomy and strut fusion with instrumentation.

### *Shoulder and Cervical Spine Surgery Recommendations*

During his next evaluation of Ms. Hunter on July 19, 2004, Dr. Sandifer agreed with a recommendation for left shoulder surgery, purportedly recommended by Dr. Atchison, finally concluding that she had received an adequate trial of conservative treatment.[4] He noted awareness of Dr. Ramos' recommendation for left wrist surgery and cervical surgery as well, but questioned in his notes whether Ms. Hunter's symptoms were predominately neck or shoulder-related.

As a result of these surgical recommendations, Ms. Hunter's attorney contacted Alliance's workers' compensation adjuster by letter on July 22, 2004, requesting that the surgeries be approved. On August 30, 2004, Alliance's counsel requested the medical records to evaluate the surgical requests, and sent notice of receipt of those records in early and mid-September of 2004.

Nevertheless, the surgeries were never approved. Ms. Hunter has continued with conservative treatment in the form of medications and cortisone injections for her continued complaints of bilateral shoulder and neck pain, swelling in those areas, and carpal tunnel syndrome. The record reflects her continuing treatment with Dr. Sandifer in two-month increments from October 12, 2004, through February 16, 2005. Significantly, Dr. Sandifer noted in his report of January 10, 2005, that Ms. Hunter would likely need surgery on both the left shoulder and the cervical spine. He repeated this sentiment in his report of February 16, 2005. Alliance commenced payment of indemnity benefits after January 10, 2005, upon receiving Dr. Sandifer's statement that surgery would be needed.

---

[4]Ms. Hunter argues on appeal that Dr. Atchison made a recommendation for shoulder surgery which was never approved; however, his records, which consist of one evaluation of Ms. Hunter on February 27, 2004, do not contain any mention of such a recommendation.

### The OWC's Rulings

After the trial of this matter, the workers' compensation judge rendered oral reasons for ruling and a subsequent judgment, in which he found that Ms. Hunter was entitled to SEB at the rate of $213.44, with legal interest from the due date, for the period of May 25, 2003 through July 5, 2003, which was the time prior to the commencement of her unemployment benefits. In addition, the court ordered that Ms. Hunter receive temporary total disability benefits at the rate of $275.00 per week from March 13, 2004, to continue in accord with La.R.S. 23:1221(1), with legal interest from the due date, less a credit for all indemnity payments made by Alliance after January 10, 2005. The court also ordered that Alliance provide Ms. Hunter with all reasonable and necessary medical treatment for her neck, shoulder, wrist, and hand injuries/conditions, including the recommended shoulder, hand and cervical spine surgeries.

The OWC also awarded penalties in the amount of $2,000.00, pursuant to La.R.S. 23:1201(F), for Alliance's failure to pay SEB after the commencement of the May 25, 2003, lay-off. Alliance was also assessed $8,000.00 in penalties, pursuant to La.R.S. 23:1201(F), for the post-August 15, 2003, violations, which included: failure to authorize Dr. Goodman's evaluation; failure to pay benefits after March 5, 2004; failure to pay benefits at the correct rate; and, failure to authorize the recommended neck surgery, with legal interest from the date of judgment. Ms. Hunter's request for reimbursement of medical treatment rendered by psychologist, Dr. Ben Arnold, was disallowed; however, she was awarded $10,000.00 in attorney fees, with interest from the date of judgment.

III.

**LAW AND ARGUMENT**

***Entitlement to Supplemental Earnings Benefits***

Alliance argues that the OWC committed error when it found that Ms. Hunter was entitled to supplemental earnings benefits (SEB) for the weeks of the lay-off period that she did not receive unemployment compensation benefits (May 25, 2003 through July 5, 2003). The company states that Ms. Hunter failed to establish at trial her entitlement to SEB. Specifically, it argues that she was not entitled to SEB because she declined available, alternative employment opportunities with Alliance and instead, chose to be laid-off and to receive unemployment benefits during the shutdown period. Alliance argues that under those circumstances, she was not entitled to SEB for any period of the lay-off.

Ms. Hunter contends, however, that at the commencement of the lay-off period, she was still bound by light-duty work restrictions and was not provided knowledge that any such positions would be available for her to work during the shutdown. As a result, she claims that she was effectively denied the option of continuing to work.

Entitlement to SEB is based upon an employee sustaining a work-related injury that results in the inability to earn 90 percent or more of his or her average pre-injury wage. La.R.S. 23:1221(3)(a). According to the supreme court, "[t]he purpose of SEBs is to compensate the injured employee for the wage earning capacity he has lost as a result of his accident." *Banks v. Indus. Roofing & Sheet Metal Works, Inc.*, 96-2840, p. 8 (La. 7/1/97), 696 So.2d 551, 556 (quoting *Pinkins v. Cardinal Wholesale Supply, Inc.*, 619 So.2d 52, 55 (La.1993)). The burden of proving entitlement to SEB initially rests with the injured worker who must establish, by a

14

preponderance of the evidence, that his or her injury resulted in the inability to earn those wages. *Id.*

As was noted by the workers' compensation judge in his oral reasons for ruling, the parties stipulated that Ms. Hunter suffered a work-related injury. In addition, although Ms. Hunter continued to work after her injury until the temporary shutdown of her work-shift went into effect, her medical records clearly indicate that her treating physicians recommended that she be placed on a light-duty work restriction within a few days of the accident. The first restriction was recommended by Dr. Long on December 3, 2002, followed by the more specific limited-duty restriction recommended by Dr. Sandifer on December 16, 2002. Ms. Hunter worked under this light-duty restriction until the May 25, 2003, lay-off date. Accordingly, the record is clear that because of her injuries, it was medically recommended that she not perform any tasks that did not fall within her light-duty restrictions.

Although Alliance claims that Ms. Hunter's lay-off was voluntary because she had the opportunity to "bid" on upcoming, vacant positions, as did all the other full-time workers on her shift who were facing being laid-off, there is no evidence in the record of her being advised of the availability of any jobs in the bid pool that met her light-duty work restrictions. The supreme court stated in *Banks*, 696 So.2d at 557, that the employer may satisfy the burden of proving job availability by establishing with competent evidence, at a minimum, the following:

> (1) the existence of a suitable job within claimant's physical capabilities and within claimant's or the employer's community or reasonable geographic region;
>
> (2) the amount of wages that an employee with claimant's experience and training can be expected to earn in that job; and
>
> (3) an actual position available for that particular job at the time the claimant received notification of the job's existence.

By 'suitable job,' we mean a job that claimant is not only physically capable of performing, but one that also falls within the limits of claimant's age, experience, and education, unless, of course, the employer or potential employer is willing to provide any additional necessary training or education.

Applying this standard, we find that the OWC did not manifestly err in determining that Ms. Hunter was entitled to SEB for the period of the lay-off that she was not receiving unemployment benefits. The record shows that Ms. Hunter carried her burden of establishing a prima facie case of entitlement to SEB. She did so by establishing a work-related injury and the inability to earn 90 percent of her average weekly pre-injury wage when her current position was temporarily eliminated due to the company lay-offs. Alliance, in turn, failed to successfully counter this assertion of entitlement to SEB. It failed because it did not satisfy its burden of establishing that a suitable job was available for her in their respective communities or in showing that a job had been offered to her that she was capable of performing. *Banks*, 696 So.2d 551.

Having found that Ms. Hunter was in fact entitled to SEB, we turn now to whether the OWC erred in assessing to Alliance a $2,000.00 penalty for its failure to pay those benefits. The failure to pay SEB, according to La.R.S. 23:1201(F), "shall result in the assessment of a penalty in an amount up to the greater of twelve percent of any unpaid compensation or medical benefits, or fifty dollars per calendar day for each day in which any and all compensation or medical benefits remain unpaid . . . ." The fifty dollars per calendar day penalty is limited to a maximum of two thousand dollars in the aggregate for any claim. La.R.S. 23:1201(F). The penalty for such a violation, consequently, must be assessed unless the employer reasonably controverts the employee's claim or proves that it had no control over the nonpayment. La.R.S.

23:1201(F)(2); *see also, Bradley v. ConAgra Poultry Co.*, 03-0023 (La.App. 3 Cir. 4/30/03), 843 So.2d 1255.

In this case, there is no assertion made that Alliance had no control over the nonpayment. Rather, Alliance has consistently asserted that it failed to pay the requested indemnity benefits because Ms. Hunter could have continued to work in a position at Alliance within her job restrictions until her regular shift was reinstated. Our focus, therefore, is on whether Ms. Hunter's claim for benefits was reasonably controverted such that Alliance was justifiable in not making the SEB payments.

An injured worker's claim is considered reasonably controverted when a court determines that the employer or insurer has not engaged in a frivolous legal dispute or that the employer or insurer possessed factual and/or medical information sufficient to reasonably counter that presented by the injured worker. *See Bradley*, 843 So.2d 1255 (citing *Brown v. Texas-La. Cartage, Inc.*, 98-1063 (La. 12/1/98), 721 So.2d 885). In this case, there is no proof in the record that Alliance offered a light-duty job to Ms. Hunter to work during the lay-off period. In addition, Alliance did not present at the trial any medical or factual information to reasonably counter the medical information that supported Ms. Hunter's light-duty work restrictions that were in effect at the time. Therefore, there was no contradictory proof presented by Alliance, which demonstrated Ms. Hunter's capability of working any jobs that did not fall within her light-duty restrictions and that were perhaps being made available to all the workers on her shift. We, therefore, find that Alliance did not reasonably controvert the claim for SEB and agree with the OWC's assessment of the $2,000.00 penalty for failure to pay SEB from May 25, 2003 through July 5, 2003.

### *Is the Neck Injury Related to the Work Accident?*

On appeal, Alliance argues that the OWC committed error when it found that Ms. Hunter's cervical injury was caused by the work accident, and further erred when it assessed to Alliance a penalty of $2,000.00 for its initial termination of medical benefits for evaluation and surgical treatment of the cervical injury. Alliance makes much of the fact that Ms. Hunter did not immediately complain of a neck injury or seek any treatment for symptoms associated with her neck until, it alleges, nearly six weeks after the accident, during a January 13, 2003, office visit with Dr. Sandifer. It argues that because of this gap in time from the date of the accident and her seeking medical treatment for the injury, Ms. Hunter is not entitled to a presumption that the injury was work-related. Alliance, consequently, asserts that proof of a work-related cervical condition rests solely on Ms. Hunter's self-serving testimony which, under the facts of this case, is insufficient to establish the causal connection. Alliance relies on *Duhon v. Scurlock Permian*, 01-0406 (La.App. 3 Cir. 10/03/01), 796 So.2d 822, *writ denied*, 01-2971 (La. 1/25/02), 807 So.2d 842, for this contention. It argues that in *Duhon*, this court stated that the plaintiff's uncorroborated testimony of an injury can be accepted only if there is no other evidence casting serious doubt on the worker's version of the incident and the worker's testimony is corroborated by circumstances following the accident.

Ms. Hunter, on the other hand, essentially argues that the neck injury was caused by the accident, but the onset of the symptoms that she was able to relate directly to her neck, was gradual. In addition, she contends that her medical records reflect regular treatment for pain and objectively noted swelling in the neck area and a subsequent diagnosis of muscle trauma as well as cervical disc problems. Accordingly, she contends that the injury is work-related and falls under the purview of workers' compensation.

18

In order to establish a claim for workers' compensation benefits, the injured worker bears the burden of establishing, by a preponderance of the evidence, that an accident occurred during the course and scope of employment, that the accident caused the worker's injuries, and that the injury caused the worker's disabilities. *Hilts v. Wal-Mart Stores, Inc.*, 02-1440 (La.App. 3 Cir. 4/2/03), 842 So.2d 465, *writ denied*, 03-1258 (La. 9/5/03), 852 So.2d 1036. In this case, the occurrence of a work-related accident has been established. The issue of causation, however, remains.

Causation issues are questions of fact, and findings on causation by the OWC are subject to the manifest error standard of review. *Edwards v. Sawyer Indus. Plastics, Inc.*, 99-2676 (La. 6/30/00), 765 So.2d 328. Accordingly, based on this record, we cannot say that the OWC was unreasonable in finding that the cervical injury was caused by the work accident.

As recounted earlier in this opinion, the record contains evidence of consistent treatment after the accident by various doctors to address symptoms of pain and objectively-detected swelling and muscle spasms on or around Ms. Hunter's neck. Treatment for these symptoms began on December 23, 2002, within a month of the accident, during an office visit with Dr. Long. Then on April 23, 2003, Ms. Hunter was diagnosed with having suffered myoligamentous and myofascial sprains and strains to the cervical spine area. She was experiencing spasms in the right side of her neck in July of 2003 as documented by Dr. Sandifer. The record also shows that because this long course of conservative treatment for these symptoms was unsuccessful, Dr. Long decided to further investigate, and ordered an MRI of the cervical spine in March 2004 (the focus of the first MRI was the bilateral upper extremeties). The diagnosis of the disc abnormalities followed. Accordingly, we do

19

not find that Ms. Hunter's complaints of experiencing a neck injury at work are based only on her own testimony.

On the other hand, Alliance only relies on the date of the purported onset of Ms. Hunter's complaints as a basis for denying that the cervical injury could have been caused by the work accident and as its basis for denying compensation benefits for treatment of the injury. This is insufficient to reasonably counter the factual and medical information provided by Ms. Hunter. *See Tillmon v. Thrasher Waterproofing*, 00-0395 (La.App. 4 Cir. 3/28/01), 786 So.2d 131. There is an ongoing obligation to review medical reports concerning an employee's injuries, and benefits are not to be denied or discontinued based on inconclusive reports. *Id.* Employers are obligated to demonstrate that reasonable efforts were made to medically ascertain an employee's exact condition before denying benefits. *Id.* We do not find that Alliance further investigated the reported injuries before denying the request for benefits. Accordingly, we find no error, as well, with the OWC's assessment of penalties for the failure to approve the evaluation by orthopedic surgeon, Dr. Goodman, or the subsequent, cervical surgery recommended by Dr. Ramos.

### *Mental Health Treatment Expenses*

Ms. Hunter argues that the OWC erroneously denied her request for the reimbursement of medical expenses incurred for mental health treatment, specifically for depression, with psychologist, Dr. Ben Arnold. Alliance responds that the court was correct in rejecting the claim for payment of Dr. Arnold's services because Ms. Hunter failed to establish that the physical injuries on the job caused her alleged depression. We agree.

20

We stated in *Autin v. Hessmer Nursing Home*, 93-1492, pp. 2-3 (La.App. 3 Cir. 6/1/94), 638 So.2d 693, 694, *writs denied*, 94-1632, 94-2212 (La. 10/7/94), 644 So.2d 634, that clear and convincing evidence of the cause of a mental injury, along with a clinical diagnosis, is required for such a mental injury to be compensated:

> In order for a mental injury caused by a physical injury to be compensable under the [workers' compensation] act, a plaintiff must show by clear and convincing evidence that the physical injury caused the mental injury, the mental injury must be diagnosed by a licensed psychiatrist or psychologist, and the diagnosis must meet the most current criteria established by the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders. La.R.S. 23:1021[8]© and (d).

Clear and convincing evidence of the link between the physical injuries and the alleged mental injury is shown by demonstrating that the existence of the disputed fact is highly probable; that is, that the condition's existence is much more probable than its nonexistence. *Boone v. Mid-State Mktg.*, 03-1032 (La.App. 3 Cir. 3/3/04), 867 So.2d 91, *writ denied*, 04-0878 (La. 6/25/04), 876 So.2d 833. In this case, there is only the testimony of Ms. Hunter, regarding her depressed mental state after the accident, and there is no medical testimony provided by Dr. Long or Dr. Arnold, nor is there testimony of any family members, for instance, to corroborate her assertions. *See id.* (finding that testimony of family members and treating medical professionals that corroborates the claimant's testimony can constitute clear and convincing evidence of the suffering of a mental injury due to a physical injury). Although we consider Ms. Hunter's internist's (Dr. Long) one-time notation regarding Ms. Hunter's complaint of experiencing anxiety and depression, her subsequent prescribing of an anti-anxiety/anti-depressant medication, as well as the two visits to psychologist, Dr. Arnold, to be corroboration of the fact that Ms. Hunter sought out treatment for these mental concerns, we find these facts insufficient to establish clear and convincing evidence of a compensable mental injury that resulted

21

from the physical injuries suffered on the job, under the facts of this case. In addition, we found that no diagnosis of depression, meeting the standard set forth by La.R.S. 23:1021(8)© and (d), is contained in Ms. Hunter's medical records.

We, therefore, conclude that the OWC correctly denied the reimbursement of Dr. Arnold's fees.

### *Payment of Dr. Sandifer's Outstanding Bill*

The OWC rejected Ms. Hunter's request for penalties for the late-payment of Dr. Sandifer's bill for treatment rendered to her on December 12, 2002. The court did so, noting first that this issue was not raised during the trial, but for the first time in Ms. Hunter's post-trial brief. It then continued, however, to address the issue, reasoning that there was no proof of late payment of the bill presented in the record because there was no proof of Alliance's receipt of the bills.

On appeal, Ms. Hunter argues that the court committed legal error by applying an improper standard to determine whether or not a penalty was due, when it focused on whether proof of the insurer's receipt of the bill had been established. Rather, Ms. Hunter argues that she provided sufficient proof that penalties for late payment were due by presenting the two mailing dates of the bill from Dr. Sandifer's office and by showing that the ultimate date of payment was beyond the sixty-day, statutory deadline for doing so.

Upon review of the record, we find that this issue was not raised during the trial of this matter, and the evidentiary record is not sufficiently developed to properly review this issue. We, therefore, decline to award a penalty for this alleged error.

*Additional Attorney Fees*

In her answer to the appeal, Ms. Hunter seeks additional attorney fees for work performed by her attorney on this appeal. The longstanding jurisprudential rule is that attorney fees due an attorney for representation in a workers' compensation matter are based on the attorney's time, skill and effort. *Miller v. Gaspard*, 95-861 (La.App. 3 Cir. 12/6/95), 664 So.2d 810 (citing *Whatley v. Lummus Co.*, 243 So.2d 922 (La.App. 3 Cir. 1970)). Based on the significant work performed in defense of, and in answer to, this appeal, we grant $2,500.00 in attorney fees to Ms. Hunter for work performed by her attorney on this appeal.

IV.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the OWC in all respects. We also grant Ms. Hunter $2,500.00 in attorney fees for work performed on this appeal. All costs of this appeal are assessed to Alliance Compressors, Inc.

**AFFIRMED.**