788 So.2d 507 (2001)
CITY OF OAKDALE
v.
Bob W. SMITH, Deceased, Dorothy Smith, Wife of Deceased.
No. 00-1792.
Court of Appeal of Louisiana, Third Circuit.
May 2, 2001.
*508 Kenneth Perrell Fuselier, Attorney at Law, Oakdale, LA, Counsel for Defendant/Appellee: Dorothy Smith.
Christopher Richard Philipp, Jamison & Philipp, Lafayette, LA, Counsel for Plaintiff/Appellant: City of Oakdale.
Court composed of COOKS, WOODARD, and PICKETT, Judges.
*509 WOODARD, Judge.
In this workers' compensation litigation, Officer Bob W. Smith died during a high-speed automobile chase. Ultimately, the workers' compensation judge concluded that his family proved, by clear and convincing evidence, entitlement to death benefits. Namely as a police investigator, Officer Smith's physical work stress was extraordinary and unusual, in comparison to that experienced by the average employee, and such physical work stress predominantly caused his fatal heart attack on February 16, 1996.
We are being asked to reverse this decision. To do so, we must conclude that the workers' compensation judge's findings were manifestly erroneous or clearly wrong. On the contrary, the record reveals no such error and affirm the trial court's decision.

* * * * *
Because Workers' Compensation Judge Morrow has done a thorough and outstanding job in relating the facts, law, and her reasoning in the instant case, we adopt the pertinent part of her opinion.
REASONS FOR JUDGMENT
This matter came for trial on the issue of whether the employee's fatal heart failure is compensable under LSA-R.S. 23:1021(7)(e). The court finds in favor of the defendant, the employee's surviving spouse, for the following reasons.
Procedural History
The employee, Bob W. Smith, died on February 18, 1996 after going into cardiac arrest during a high speed car chase in the course and scope of his employment with the City of Oakdale. Smith was the Investigator for the Oakdale Police Department at the time.
Benefits were instituted and paid to Dorothy Smith on her behalf, and on behalf of the two minor children. Benefits were terminated approximately in April of 1998. On May 7,1998, a disputed claim form 1008 was filed with the Office of Workers' Compensation on behalf of the City of Oakdale. The "bona fide dispute" at section 15(C) of the form set forth the following:
Employer investigation concludes significant history of congestive heart failure, hypertension, preexisting dilated cardiomyopathy and family history of early cardiac mortality were predominant and major cause of death, not employment related physical stress. Accordingly, no death benefits are owed. Employer entitled to repayment of benefits mistakenly paid.
On or about October 28, 1998, an answer and disputed claim form 1008 were filed on behalf of Mrs. Smith and her children, seeking reinstatement of benefits. Trial was conducted over two days, and the matter taken under advisement.
Facts of Occurrence
The occurrences of the morning of February 16, 1996 are not in dispute, and are established through the Oakdale Police Department log sheet for that day (employer's exhibit # 9) and the testimony of Lieutenant Charles Powers and retired Chief Virgil Chamberlain.
As the Investigator for the Oakdale Police Department, Bob Smith worked a regular shift of 7 or 7:30 a.m. to 3 or 3:30 p.m. and was assigned his own vehicle. The log reflects that at 8:24 a.m. a call was received reporting a car theft. Charles Powers was the shift supervisor that day, and it was his job to respond. He testified that standard operating procedure would have been for him to *510 ride in car 0D9 with officer Dill driving. Powers went the vehicle and realized that Dill had the key. Powers did not know where Dill was. Had Powers been in possession of the car keys, he would have responded on his own and left Dill. Powers turned back to the office and saw that Bob Smith had come out. Powers went to the passenger side of Smith's car. They entered the vehicle and proceeded with Smith driving.
While traveling, they came upon the stolen vehicle. The log reflects notification at 8:37 or 8:39 that Powers and Smith had the stolen vehicle in view. Smith's police vehicle was unmarked. Powers testified that when the police vehicle lights were turned on, the stolen vehicle accelerated, and he and Smith were traveling at a speed of 85 miles per hour. They were traveling on Highway 165, a 2-lane highway. The stolen vehicle passed several vehicles, weaving in and out of traffic, and at times, the officers passed vehicles they would not ordinarily have passed. The officers stayed with the stolen vehicle until it passed an eighteen-wheeler. At that point Smith began pulling off the road and was coughing and possibly spitting up blood. Smith pulled off the road and told Powers that Powers would have to drive. The log reflects an entry at 8:43 that the pursuit was terminated. Smith got out of the car, moved toward the passenger side, and asked Powers to request an ambulance, which Powers did. Smith was taken to the Oakdale hospital, and upon arrival had no pulse and no blood pressure. He was resuscitated, then airlifted to an Alexandria hospital where he died on February 18 without regaining consciousness.
Discussion
The applicable statute in this case is LSA-R.S. 23:1021(7)(e) which provides:
"A heart-related or perivascular injury, illness, or death shall not be considered a personal injury by accident arising out of and in the course of employment and is not compensable pursuant to the Chapter unless it is determined by clear and convincing evidence that:
(i) The physical work stress was extraordinary and unusual in comparison to the stress or exertion experienced by the average employee in that occupation,
and
(ii) The physical work stress or exertion, and not some other source of stress or pre-existing condition, was the predominant and major cause of the heart-related or perivascular injury, illness, or death."
The employer contends that (1) Smith's physical work stress was not extraordinary or unusual at the time of the occurrence, and (2) the evidence does not support that the physical work stress or exertion was the predominant and major cause of the death, rather, the heart failure was related to Smith's pre-existing heart condition.
Whether the work stress was "extraordinary or unusual"
The evidence on the issue of whether Smith's work stress that morning was "extraordinary or unusual" focused primarily on whether Smith was required or expected to engage in a high speed car chase as a part of his job duties as the Department Investigator. An initial thought may be that police officers chase suspects. That is the job of a police officer. However, Smith's job was that of Investigator, a Civil Service position. The job description of Police Investigator was introduced as employer's *511 exhibit # 10. The "General Statement of Duties" provides:
This is specialized law enforcement work involving the initial and follow-up investigations of crimes committed within the jurisdiction. The employee of this class has the authority to work independently in most areas under the general direction of the police chief. He/she personally performs all duties of this position, which may include interviewing victims and witnesses of crimes, locating, identifying and preserving evidence for use in prosecution of persons suspected of committing crimes, and any necessary related duties.
There was testimony from a number of members of the Oakdale Police Department as to the duties of the Investigator. Current Chief Bobby Gordon, who was Assistant Chief at the time of Smith's death, testified that the primary duty of the Investigator is follow up investigation such as taking measurements at a crime scene, making sketches, taking photographs, taking witness statements, organizing line-ups, discussing the case with the prosecutor, and other similar activities after the commission of the crime, when the suspect has left the scene. He testified that "line officers" are responsible for patrolling and every day work, and the line officers report to the Investigator the things which need to be investigated. He testified that if an emergency situation arose, the investigator may step up to assist, but it would not be his normal duty. Gordon acted as a temporary investigator for a while, but engaged in no physical arrests or chases during that tenure.
Lieutenant Powers testified that the department no longer has the position of Investigator, and that those duties have been given to the Lieutenants, he and Lieutenant Guines, [sic] who also testified. He does not engage in high speed chases, as that is a duty of the patrol officer. While Smith often made arrests, the typical situation was a suspect brought in for questioning who confessed, filled out an affidavit, and the arrest was made without a warrant.
The testimony of Lieutenant Michael Guynes [sic] was similar to that of Powers and Gordon. Guynes further testified that he never saw Smith engage in physical or violent work, and if Smith had done so, Guynes would have heard about it. It would have been like the Chief of Police doing it, a rare occurrence.
Retired Chief Virgil Chamberlain, Jr. appointed Smith to the Investigator position in 1984 or 1985, and served as the investigator himself for 12 or so years. He summarized the general duties of the investigator as following up crimes, talking with people and collecting and preserving evidence to work up the case. He testified it was the duty of the line officer, not the investigator, to subdue suspects or chase suspects on foot or in a car.
The employer presented testimony from Leonard Francois, accepted as a vocational rehabilitation expert. Francois reviewed the Civil Service job description, the Dictionary of Occupational Titles, the statement of Lieutenant Powers, and interviewed the Police Chief and a detective in Breaux Bridge, which Francois believed to be a comparable city to Oakdale. He testified that Smith was within the normal scope of his job duties as Police Investigator while engaging in the high speed chase. He testified that someone in Smith's position could be expected to be called upon to perform activities such as a high speed chase.

*512 With all of the above testimony in mind, however, the court believes the proper inquiry is not whether Smith was, in effect, in the course and scope of his duties on the morning of February 16, 1996. The question is whether the duties he was performing were unusual or extraordinary. The court has little problem in answering in the affirmative. The court believes Lieutenant Powers summed it up when he testified that a chase is not an ordinary event. A chase is extraordinary, and even more so for an investigator as opposed to a line officer. Powers himself had engaged in maybe 15 high speed car chases over the 7 to 8 year period he served before becoming a Lieutenant.
Lieutenant Guynes likewise testified that a high speed car chase is not an ordinary occurrence, occurring maybe 4 to 5 times per year, at the most. He testified that very long chases are extraordinary, and he considered this one to be a long chase.
The law does not require that the job duty being performed be a duty outside of the employee's job description. The statute requires that the physical work stress be extraordinary and unusual in comparison to the stress or exertion "experienced by the average employee in that occupation." It is the "usual duties of the position to which [the employee] and his peers are assigned" that forms the basis of a claimant's occupation against which perivascular claims are to be measured. Downs v. J. & J. Maintenance, Inc. 97-511 (La.App. 3 Cir. 10/8/97), 702 So.2d 845. The only evidence as to the "average employee in that occupation" is the testimony of the Oakdale officers as to the work of the investigator in that department, the testimony of Mr. Francois as to the Breaux Bridge department, which did not controvert the testimony that a high speed chase is unusual even for the line officers, and the Civil Service job description, which says little on the subject of apprehension of suspects and nothing about chases.
In Johnson v. Petron, Incorporated, 617 So.2d 1358 (La.App. 3 Cir.1993) the court stated:
"... The language of the new law is `extraordinary and unusual' in comparison to the stress or exertion experienced by the average employee in that occupation. `Ordinary' and `usual' are synonyms, and `extraordinary' and `unusual' also mean about the same thing. Webster's defines `extraordinary' as `going beyond what is usual, regular or customary.' The claimant had to prove merely that his physical work stress went beyond what was usual, regular or customary in relation to the average employee in that occupation. The amendment contains no minimum standard by which one had to exceed the other." 617 So.2d at pages 1361-1362[.]["]
Using the "occupation" of police investigator, the court finds the evidence clearly and convincingly establishes that a high speed chase was" extraordinary and unusual" physical work stress.
Whether the work stress was the predominant and major cause of death
The parties submitted the depositions of 3 physicians: Dr. George B. Mowad, board certified in family practice (employee exh. # 1), Dr. Madhusudana Rao Ghanta, board certified pediatric specialist and family practitioner (employer exh. # 1), and Dr. C.V. Manuel, board certified in internal medicine, cardiovascular disease and critical care medicine (employer exh. # 3). Each of the physicians *513 had provided treatment to Bob Smith at some point in time.
The employer, in its final reply brief, summarizes the medical evidence as follows: "In summary, it was the physical and mental stress acting upon Mr. Smith's pre-existing condition which caused his cardiac problem." This is a fair synopsis of the medical evidence. That evidence establishes that in January 1990 Dr. Mowad diagnosed Smith with hypertension and started him on blood pressure medication. Hospital records show that Dr. Mowad then saw Smith in the hospital on March 4, 1990, for complaints of nausea, vomiting and chest pain. A cardiovascular consult was obtained with Dr. Manuel. Dr. Manuel testified that Smith's blood test showed an infection, the electrocardiogram was abnormal in that the heart was beating a little fast, and testing also revealed a left bundle branch block, or electrical conduction abnormality. (Dr. Manuel testified that it was unlikely that the left bundle branch block contributed to Smith's death.) Smith was treated with medication, and discharged on March 7 with a diagnosis of early cardiomyopathy and acute gastroenteritis. Dr. Manuel testified that the admit appeared to have been more for gastroenteritis, but his impression was possible cardiomyopathy or myocarditis. He recommended a cardio-catheterization, which was performed by Dr. King White in Lake Charles on March 9, 1990. That procedure showed that the coronary arteries were normal and completely free of disease. (Employer's exh. # 5) Dr. Manuel testified that this would confirm his diagnosis of cardiomyopathy. The cardiomyopathy manifested in Smith as a slightly enlarged left ventricle with a slight loss of function.
Smith next received medical treatment on January 11, 1991 when he was seen by Dr. Ghanta for an upper respiratory infection. Smith was admitted to the hospital on January 13 when the infection worsened, with bronchial spasm and possibly pneumonia. Dr. Manuel was brought in for a cardiology consultation as Smith's heart condition was a high risk factor. Dr. Manuel testified that Smith's heart condition in 1991 was not much different from 1990, and in fact, was almost the same. Smith was discharged from the hospital on January 17 with a discharge diagnosis of allergic bronchitis with bronchospasm, hypertension, congestive heart failure and possible cardiomyopathy. After the January 17, 1991 discharge, there was no medical treatment of note until Smith's fatal heart failure.
It would appear from the medical evidence that the diagnosis of Smith's heart condition was fortuitous. The heart condition was only discovered and addressed incidentally to Smith's treatment for gastroenteritis and bronchitis. Smith's wife and co-employees were apparently not even aware of the heart condition. Smith received no medical treatment which was precipitated by his heart condition prior to his fatal incident. The lay testimony established he manifested no signs of either a heart condition or his hypertension.
Without question Smith had a preexisting condition. However, the court finds that the heart failure and death were clearly precipitated by his unusual work activity.
There was ample testimony from the witnesses as to the extreme physical and emotional stress involved in a high speed car chase. Dr. Mowad testified that the stress, tension and tightening of the muscles during the high speed chase would have been the most likely triggering factor for Smith's heart failure. *514 (Employee ex. # 1, page 34) Dr. Ghanta testified that the undue stress of the chase would have been the precipitating and predominant cause of the attack. (Employer's ex. # 1, pp. 20, 32, 33) He testified that Smith could have worked safely for another 10 years or so given his condition, and that there was very little chance that Smith would have had a heart attack without the car chase.
(Employer's ex. # 1, pp. 25, 35)
Dr. Manuel clarified that he couldn't say that Smith had a "heart attack" insofar as that terminology refers to an artery getting blocked off, causing death of part of the heart muscle. Rather, Smith's heart may have stopped pumping, or pumped ineffectively. (Employer's ex. # 3, p. 30) He opined that Smith probably developed an abnormal heart rhythm which caused a deterioration of function. (Employer's ex. # 3, p. 31) He testified that in the presence of heart disease, any stress can precipitate a sudden deterioration, and that the stressful situation probably precipitated an event at that time.
(Employer's ex. # 3, pp. 35, 42)
The employer contends that the medical testimony falls short of the required standard because no physician opined that the job activity was the "predominant major" cause of death as required by the statute, and because Smith had a pre-existing cardiac condition which played a significant part in his cardiac arrest.
The jurisprudence clearly reflects that the phrase "predominant and major" is not a magical charm to determine whether the burden of proof has or has not been met. Debona v. Alexandria Pawn, 94-430 (La.App. 3 Cir. 11/2/94) 649 So.2d 449, writ denied at 94-2878 (La.1/27/95), 650 So.2d 242. The jurisprudence further reflects that the existence of a pre-existing condition or risk factor alone will not prevent recovery under the statute. Harold v. LaBelle Maison Apartments, 94-0889 (La.10/17/94), 643 So.2d 752. Instead, the courts have interpreted the heightened burden of 23:1021 as being an intent to exclude from coverage an employee who just happened to have a heart attack while performing his job. Johnson v. Petron, 617 So.2d 1358 (La.App. 3 Cir. 1993), Morris v. Reve, Inc., 95-310 (La. App. 5 [Ci]r. 10/18/95), 662 So.2d 525, writ denied at 95-3037 (La.2/16/96), 667 So.2d 1055.
No physician in this case suggests that it was fortuitous that Smith suffered his cardiac event during a high speed chase. Further, the physicians are in agreement that the high speed chase was probably the triggering or precipitating factor in the cardiac event. As discussed by the court in Debona, supra, this court believes the physicians' felt that absent the job exertion Smith experienced, he would not have suffered a cardiac event on the job or elsewhere on February 16, 1996, and therefore, the use of the words "precipitate" or "trigger" were meant to be synonymous with predominant and major. The court finds the evidence to be clear and convincing that Smith's job activities at the time of the cardiac event were the predominant and major cause of his death.
The employer is liable unto Dorothy Smith and her minor child for death benefits as provided by law, together with interest and all costs of this suit.

CONCLUSION
Based on the foregoing, we affirm and assign all costs of this appeal to Appellant.
AFFIRMED.