# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 06-1480


**ELLA MAE SMITH**

**VERSUS**

**KINDER RETIREMENT AND REHABILITATION CENTER**


**\*\*\*\*\*\*\*\*\*\***


APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION - # 3
PARISH OF CALCASIEU, NO. 04-02910
SAM L. LOWERY, WORKERS' COMPENSATION JUDGE

**\*\*\*\*\*\*\*\*\*\***


**ULYSSES GENE THIBODEAUX
CHIEF JUDGE**

**\*\*\*\*\*\*\*\*\*\***


Court composed of Ulysses Gene Thibodeaux, Chief Judge, Marc T. Amy, and Glenn B. Gremillion, Judges.

                                                    **AFFIRMED AND REMANDED.**


**Marcus Miller Zimmerman
4216 Lake Street
Lake Charles, LA 70605
Telephone: (337) 474-1644
COUNSEL FOR:**
        **Plaintiff/Appellee - Ella Mae Smith**

**Craig Alan Davis
111 Mercury Street
Lafayette, LA 70503
Telephone: (337) 231-5351
COUNSEL FOR:**
        **Defendant/Appellant - Kinder Retirement and Rehabilitation Center**

**THIBODEAUX, Chief Judge.**

This case involves a workers' compensation claim brought by the claimant, Ella Mae Smith ("Mrs. Smith"), against her employer, Kinder Retirement and Rehabilitation Center ("Kinder"). In October 2003, Mrs. Smith suffered a heart attack while attempting to transport and single-handedly clean feces from a handicapped and disoriented male resident following an incident in a men's room in New Orleans. The Office of Workers' Compensation ("OWC ") found in favor of Mrs. Smith and awarded wage and medical benefits, and also awarded penalties and attorney fees. Kinder appeals. For the following reasons, we affirm the judgment issued below, award Mrs. Smith attorney fees for the work done on appeal, and remand for a determination of the amount of offsets and credits applicable herein, as more fully set forth below.

## I.

## ISSUES

We must decide:

(1)    whether the OWC erred in finding that Mrs. Smith's heart attack in October 2003 was a compensable injury under La.R.S. 23:1201; and

(2)    whether the OWC erred in awarding penalties and attorney fees to Mrs. Smith for Kinder's denial of wage and medical benefits.

## II.

## FACTS AND PROCEDURAL HISTORY

Mrs. Smith began working for Kinder in 1981 as a Restorative Certified Nursing Assistant (CNA), caring for physically and mentally handicapped residents at the retirement and nursing facility. At the time of the October 31, 2003 heart attack that is the subject of this claim, Mrs. Smith was sixty years old and had been

employed with Kinder for approximately twenty-two years. She had suffered a heart attack at home on January 28, 2002, but had returned to work in mid-2002 in a light-duty capacity where she was to assist another CNA, or be assisted, in caring for patients rather than doing the work on her own as she had previously done. Her new light duties included walking the patients around for exercise and accompanying them, but not lifting and bathing them. However, Kinder soon had Mrs. Smith back on full-duty working with residents on her own. Prior to the October 2003 heart attack, Mrs. Smith had never filed a workers' compensation claim in the twenty-two years that she had been employed with Kinder.

On October 31, 2003, Mrs. Smith was working alone, accompanying a physically and mentally handicapped male resident to an appointment with an eye doctor in New Orleans. The male resident was approximately six feet tall and weighed over 200 pounds, while Mrs. Smith is five feet two inches tall and somewhat heavy set, though discrepancies in the record make it difficult to determine whether she weighed in the 160's, 170's or 180's at the time of the incident. Mrs. Smith and the nursing home resident were being driven in a van by a contract driver who was not an employee of the Kinder facility. In contrast to the assistance provided by Kinder employee-drivers, the contract driver offered no assistance to Mrs. Smith. After waiting in the lobby for approximately six hours to get her patient in to see the eye doctor, Mrs. Smith was called to the telephone, and her Kinder patient disappeared. Mrs. Smith found him in the men's bathroom where he had somehow managed to soil himself with feces from his head to his toes.

Alone, Mrs. Smith struggled to undress the disoriented male resident, while he responded in a rigid, angry, and jerky manner, impeding her efforts rather than giving her assistance of any kind. Mrs. Smith testified that the patient was

2

agitated and moving around, that he kept backing up and waving his arms around, and that she had a hard time holding him. She stated that she was scared and worried and thought that she would pass out. Mrs. Smith managed to put the resident on a commode, where she cleaned him as well as she could with paper towels. She cleaned the floor around him with paper towels and disposed of his soiled clothing. Mrs. Smith then went to the receptionist and obtained a set of scrubs. She struggled to dress him while he waved his arms and pulled them back through the shirt sleeves. Once dressed, she took him back to the lobby. She was experiencing weakness and shortness of breath. At approximately 4:30 p.m., the resident was finally called for his 8:30 a.m. appointment. At that point, Mrs. Smith was unable to take the resident further and could not assist him to the doctor's examining room. She managed to put him in a wheel chair and get him in the van. She then lost consciousness.

Mrs. Smith was driven back to the Kinder facility, where an ambulance picked her up and transported her to Oakdale Community Hospital around 8:05 p.m. She was treated there for congestive heart failure. At 11:05 p.m. she was discharged and transported to Rapides Regional Medical Center in Alexandria, Louisiana, where she remained for three weeks. Mrs. Smith underwent left heart catheterization, left ventriculography, coronary angiography, and four-vessel cardiac by-pass surgery. She was discharged from Rapides Regional Medical Center on November 20, 2003. Mrs. Smith has not worked since the October 31, 2003 heart attack. She has never been released to full duty, and there have been no vocational rehabilitation efforts to determine what she can and cannot do; nor has there been an offer of lighter duty work by Kinder. Her wages were terminated on November 3rd or 5th, just a few days after her heart attack, and Kinder has paid no medical or wage benefits on her behalf.

Mrs. Smith received short term disability payments for about six months in 2003 and 2004.

Mrs. Smith filed a 1008 claim against Kinder asserting that no wage benefits had been paid and describing the details of the heart attack and subsequent surgery. The OWC found that Mrs. Smith's heart attack in October 2003 was a compensable injury. Accordingly, the OWC awarded her medical benefits and wage benefits based upon weekly wages of $223.24, which amount was stipulated to by the parties, including back wages with judicial interest, all subject to the appropriate credits and offsets. The OWC further awarded Mrs. Smith $7,000.00 in attorney fees, as well as penalties of $2,000.00 for the employer's denial of wage benefits and $2,000.00 for the employer's denial of medical benefits. Kinder suspensively appealed. Mrs. Smith answered the appeal and asserts an entitlement to court costs and additional attorney fees for the work done on appeal.

III.

## LAW AND DISCUSSION

### Standard of Review

The supreme court has discussed the standard of review in workers' compensation cases as follows:

> In worker's compensation cases, the appropriate standard of review to be applied by the appellate court to the OWC's findings of fact is the "manifest error-clearly wrong" standard. *Brown v. Coastal Construction & Engineering, Inc.*, 96-2705 (La.App. 1 Cir. 11/7/97), 704 So.2d 8, 10, (citing *Alexander v. Pellerin Marble & Granite,* 93-1698, pp. 5-6 (La. 1/14/94), 630 So.2d 706, 710). Accordingly, the findings of the OWC will not be set aside by a reviewing court unless they are found to be clearly wrong in light of the record viewed in its entirety. *Alexander*, 630 So.2d at 710. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon

4

review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. *Robinson v. North American Salt Co.*, 02-1869 (La.App. 1 Cir. 2003), 865 So.2d 98, 105[, *writ denied,* 03-2581 (La. 11/26/03), 860 So.2d 1139]. The court of appeal may not reverse the findings of the lower court even when convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. *Robinson*, 865 So.2d at 105.

*Dean v. Southmark Const.*, 03-1051, p. 7 (La. 7/6/04), 879 So.2d 112, 117. With

regard to credibility findings, we have further articulated:

> When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings; for only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong.

*Custis v. Whitaker Const.*, 95-1110 (La.App. 3 Cir. 1/31/96), 670 So.2d 339, 344, *writ*

*denied,* 96-0553 (La. 4/19/96)*,* 671 So.2d 920 (quoting *Bruno v. Harbert Intern., Inc.*,

593 So.2d 357, 361 (La.1992)) (quoting, *Rosell v. ESCO*, 549 So.2d 840, 844-45

(La.1989)).


**Physical Stress and Exertion**

Kinder contends that the trial court erred in finding Mrs. Smith's 2003

heart attack a compensable injury under La.R.S. 23:1021(7)(e), currently renumbered

as La.R.S. 23:1021(8)(e). The statute requires a claimant to prove by "clear and convincing" evidence that:

> (i) The physical work stress was extraordinary and unusual in comparison to the stress or exertion experienced by the average employee in that occupation, and

> (ii) The physical work stress or exertion, and not some other source of stress or preexisting condition, was the predominant and major cause of the heart-related or perivascular injury, illness, or death.

Kinder argues that Mrs. Smith's job was to clean up patients, that she had cleaned patients who soiled themselves on numerous occasions, and that there was nothing extraordinary or unusual about the incident in New Orleans. At trial, the only person to testify was Mrs. Smith. She testified that after her 2002 heart failure, she was released to light duty work only, and that her normal duties were supposed to include only walking the ambulatory patients for exercise, feeding them, and assisting others with their care, but not bathing and cleaning them, which requires more physical exertion. Mrs. Smith specifically stated that she did not put the patients in the shower any more. She further testified that the day at the eye clinic with the resident in New Orleans was not a normal day for her but was different and harder than usual. She stated that when she accompanied a resident to an appointment, even if she did not have another CNA assisting her, the driver was usually a Kinder employee who assisted her with the resident, not a contract driver, as in this case, who did nothing to assist Mrs. Smith.

This resident, who had managed to get his own feces from his head to his toes, and even on his back, was heavier and significantly taller than Mrs. Smith, and he was angry and non-compliant when she tried to strip him, clean him with paper towels, and re-dress him. She described her physical struggle with the patient,

stating that he kept pulling away from her and moving his arms up and down when she tried to put his arm through a sleeve. She struggled physically with him but stated that she felt obligated to take care of him. She became scared, weak, short of breath, and thought she was going to die.

The OWC found that the fact that this incident took place in an office building in New Orleans and not in the nursing home facility in Kinder rendered it unusual and extraordinary. There were no showers, cloths or towels, or pans of soapy water, and no assistants to help a five-foot two inch woman with a rather large, angry, and agitated six-foot man who kept jerking and moving away from his caretaker. In analogizing this incident, the workers' compensation judge observed:

> [I]t is counterintuitive to view the situation she was accustomed to dealing with in the confines of a nursing facility [sic] the same as she unexpectedly encountered in a men's room of a clinic more than 150 miles away from the support system she was normally provided.

> The analogy is weak and rough hewn, but it's a little like saying that changing tires is customary for a mechanic and it makes little difference whether the task is done in his garage or in the passing lane on I-10 during rush hour.

> If, for a purely academic exercise, one were to put the task of cleaning a soiled patient on a continuum to reflect normal on one end and extreme on the other, the New Orleans episode would bump up hard against the latter.

We agree. The first prong of La.R.S. 23:1021(8)(e) is met, in that the physical work stress in this case "was extraordinary and unusual in comparison to the stress or exertion experienced by the average employee in that occupation."

Kinder contends that Mrs. Smith had a preexisting heart condition and that she was bound to have another heart attack at some point. Thus, the second prong, that the "physical work stress or exertion, and not some other source of stress

7

or preexisting condition" be "the predominant and major cause of the heart-related" injury is not satisfied. However, the jurisprudence is clear that the existence of a preexisting heart condition or risk factor alone will not prevent recovery of workers' compensation benefits for a work-related heart attack. *City of Oakdale v. Smith,* 00-1792 (La.App. 3 Cir. 5/2/01), 788 So.2d 507, *writ denied,* 01-1596 (La. 9/14/01), 796 So.2d 685, (citing *Harold v. LaBelle Maison Apartments*, 94-0889 (La. 10/17/94), 643 So.2d 752).

Our legislature did not intend to completely eliminate heart-related injuries as compensable accidents arising in the course of employment; rather, it meant only to restrict recovery in some cases. *Debona v. Pawn*, 94-430 (La.App. 3 Cir. 11/2/94), 649 So.2d 449, *writ denied*, 94-2878 (La. 1/27/95), 650 So.2d 242. The courts have interpreted the heightened burden of La.R.S. 23:1021 as being an intent to exclude from coverage an employee who just happens to have a heart attack while performing his job. *City of Oakdale*, 788 So.2d 507, (citing *Johnson v. Petron*, 617 So.2d 1358 (La.App. 3 Cir.), *writ denied,* 623 So.2d 1338 (La.1993)). The phrase "predominant and major" is not a "magical charm" to determine whether the burden of proof has or has not been met. *Id*. at 514.

Jerome J. Arimura, M.D., Medical Director of Advanced Medical & Diagnostic Center of Lake Charles, reviewed Mrs. Smith's medical records from Moss Regional Medical Center regarding her first heart attack in January 2002, and he reviewed her records from Oakdale Community Hospital and Rapides Regional Medical Center regarding her October 2003 heart attack. Dr. Arimura's written opinion stated that Mrs. Smith had spent four days in the hospital following her January 2002 admission because of congestive heart failure, anemia, pulmonary disease, and urinary tract infection, among other conditions. The record indicates that

8

Mrs. Smith went back to work around April or May of 2002, and did well for a year and a half, from mid-2002 until the second heart attack occurred on October 31, 2003. Dr. Arimura stated that at the time of the second attack that resulted in a cardiac catheterization, 4-vessel coronary artery by-pass graft, and a three-week hospital stay, Mrs. Smith's risk factors included the prior 2002 cardiac disease, her smoking, hyperlipidemia, and iron deficiency anemia.

Dr. Arimura further stated that with the risk factors in place, it was not unreasonable to expect that the additional stressors such as increased physical exertion and the increased emotional stress experienced on October 31, 2003, had "precipitated an acute MI event." Dr. Arimura specifically opined: "In other words, Ms. Smith's work-activity as a nurse's aide, attending to the resident at the Lyon's Eye Clinic in New Orleans[,] was the predominant and major cause of the heart attack."

On August 18, 2005, almost two years after the subject heart attack, Kinder asked New Orleans cardiologist, David J. Elizardi, M.D., to conduct a history interview and perform a physical examination of Mrs. Smith. His report stated that, while he did not see the actual records, he saw references in other records to cardiac catheterizations in April and May of 2002 following her congestive heart failure in January 2002. He stated that she seemed to do well from mid-2002 until her difficulty on October 31, 2003. Dr. Elizardi stated that he asked her about her work duties, and that she indicated that she assisted in cleaning people up but usually in a shower, not in a bathroom with just paper towels.

Dr. Elizardi then briefly discussed the acute myocardial infarction on October 31, 2003, stating that Mrs. Smith was in respiratory arrest and semicomatose in the ambulance that took her to Oakdale Community Hospital. He briefly described

the November 2003 by-pass surgery at Rapides Regional, stating that this was her first surgery, and that she was taking no medications prior to the January 2002 event. He further stated that in comparing the May 2002 and November 2003 catheterizations, that there was an obvious progression of her coronary atherosclerosis, and that she was currently free of cardiovascular symptoms and was being actively medically-managed.

With regard to causation, Dr. Elizardi reported that Mrs. Smith said that her job duties on October 31, 2003, were no different than on any other day, and that the only difference he could discern was the length of the trip and the location of the resident's accident and clean-up. He opined that since "she was not performing any activities that were well above or beyond those over her usual job duties . . . , I would conclude that this heart attack was not caused by her job duties." He further stated that, "[w]hether or not her activities of that date . . . caused her heart attack is, at best, not something that can be determined with any probability." Dr. Elizardi further reported, that "[s]pontaneous myocardial infarctions can occur under a myriad of circumstances, some of which do include increased stress or increased work demands, but, just as frequently, they can occur when the individual is sedentary, or even while asleep." Dr. Elizardi basically called it non-scientific speculation to link her activities of that day to her heart attack, given the preexisting condition. His opinion was that the heart attack occurred during the performance of usual activities, which "did not appear to be in extreme environments" and that her attack was not a "work-related complication."

While Dr. Elizardi reported that Mrs. Smith herself admitted that her work duties on October 31, 2003, were like a normal day of activities for her, Mrs. Smith disagreed with this at trial. More specifically, Mrs. Smith testified at trial that

Dr. Elizardi's reporting that she had said that cleaning up patients was among her normal duties on the day of the October 2003 heart attack was a result of his leading her during his interview with her, telling her that what she did that day was within her normal duties and leading her into agreeing. What she indicated was that she had cleaned up a lot of patients during her twenty-three years with the nursing home; however, she no longer did that alone after her first heart attack because it was too strenuous.

The workers' compensation judge stated in his reasons for judgment as follows:

> I watched her carefully as she testified, and what she lacked in ability to articulate clearly, she made up for in sincerity, credibility, and a matter of conveying the extreme pressure she was put under because of her concern for her patient in this unusual and highly stressful situation.

While Kinder argues that more weight should be given to Dr. Elizardi's opinion since he is a cardiologist, the workers' compensation judge stated that, "[a] close reading of the medical opinion forces me to agree that the defendant's doctor is working a little extra hard to advocate the defendant's position." As counsel for Mrs. Smith points out, Dr. Elizardi was not in a position to determine whether Mrs. Smith's duties were normal or unusual on October 31, 2003, as that was not a medical inquiry. As for his the purely medical opinion, Dr. Elizardi agreed that myocardial infarctions "can occur under a myriad of circumstances, some of which do include increased stress or increased work demands." The workers' compensation judge found Mrs. Smith's testimony credible and found the work demands on October 31, 2003, to be unusual and the work stress extraordinary. He apparently believed that Dr. Arimura's opinion was sufficient to guide him in determining causation.

11

"In a workers' compensation case, the determination of causation and disability is legal rather than medical. It is the hearing officer who determines causation and disability and *not* the expert witnesses." *Debona*, 649 So.2d at 454 (citing *Jackson v. D.C. Kile, Inc.*, 614 So.2d 225 (La.App. 3 Cir.), *writ denied*, 616 So.2d 702 (1993). Accordingly, we agree with the OWC and find that the second prong of the statute has been met. That is, the unusual physical exertion and increased work demands while dealing with the handicapped patient in New Orleans by herself was the major cause of Mrs. Smith's second heart attack on October 31, 2003. As in *Debona*, Mrs. Smith was working and was able to work before October 31, 2003, and had in fact been doing well for a year and a half, having recovered from the January 2002 coronary event by mid-2002.

## Nature of Benefits

Kinder asserts that the OWC's finding that Mrs. Smith was entitled to temporary total disability (TTD) wage benefits and medical benefits after the second heart attack was erroneous. Kinder argues that she voluntarily chose not to go back to work at the nursing home after the second heart attack, and that she has failed to show that she is unable to return to her former occupation as a CNA. In support of this position, Kinder references two doctor's slips, included with the exhibits, indicating that Mrs. Smith has not been taken off work by her physician. Both notes are addressed "To Whom It May Concern" and are written by Mrs. Smith's physician, Dr. Lie, on Moss Regional Medical Center note paper. The first note is dated January 20, 2004 and states: "Mrs. Smith is under my care. She will return to work after treatment of ECHO CARDIOGRAPHY." The second note is dated February 17, 2004 and states: "Mrs. Smith is a 60 year old woman who is under my care. She had

open heart surgery that impairs her work. She is unable to work in full duty at this time."

With regard to less than full duties, Mrs. Smith testified that Kinder had called her only once to inform her that she should let them know when she could return to work. There was no discussion regarding what she was able to do and not do *after* the second more serious attack, particularly where she was already supposed to be on light duty *before* the second attack. Mrs. Smith herself testified that she did not return because she was unable to keep up the pace of the nursing home work that she had done before.

Counsel for Mrs. Smith argues that the judgment of the OWC does not state that Mrs. Smith is "TTD," temporarily totally disabled, and that the parties' stipulation as to her weekly indemnity rate of $223.24 was not a stipulation to a "TTD" rate. Rather, counsel for Mrs. Smith argues, the judgment of the OWC awarded SEB's, supplemental earnings benefits, at the maximum rate to which she was entitled, or based upon zero earning capacity. More specifically, with regard to Mrs. Smith's wage benefits, the Reasons for Judgment state:

> As to Ms. Smith's claim that she cannot return to work, I will note that there has not been a vocational rehabilitation evaluation by the employer as to whether any job offer would meet any job restriction placed on her, and I heard no evidence that contradicts her testimony as to her inability to work.

> Given this woman's 20 years of service to the employer, who is in the business of health care, coupled with her known heart problems, I am not really sure why the claim was handled in this fashion.

> The court rules that the October 31st, 2003, incident was proven by clear and convincing evidence as the predominant and major cause of Ms. Ella Mae Smith's heart attack on that date and the evidence supports her

inability to return to work for the employer. The claim is compensable from that date with appropriate credits and offsets allowed.

Accordingly, the OWC found that the second heart attack was compensable from the date that it occurred, October 31, 2003. With regard to the compensation that she should receive, the OWC judgment provides:

1. Claimant suffered a compensable work-related accident on October 31, 2003.

2. As a result of this compensable accident, claimant has been disabled from returning to her pre-injury job-duties, and is thus entitled to, and defendant is responsible for, indemnity benefits based on a weekly indemnity benefit of $223.24 and *continuing until such benefits can be reduced or eliminated in accordance with the law*. The back-payment of these indemnity benefits shall also include the appropriate legal/judicial interest.

(Emphasis added).

While the judgment did not specify the nature of the benefits, that is not error. It is clear that Mrs. Smith was at least temporarily totally disabled from the date of the heart attack until after she recovered from the open heart surgery. The February 17, 2004 note from Mrs. Smith's general physician at Moss Regional, Dr. Lie, does not specifically release her to light duty, but it does state that she could not work full duty at that time. Therefore, according to Kinder, Mrs. Smith should have returned to work in some capacity on February 17, 2004. However, as noted by the workers' compensation judge, there was no vocational rehabilitation done to determine what she could do and what was available. Mrs. Smith argues that she is entitled to supplemental earnings benefits[1] based upon her current earnings of zero.

---

[1]Kinder argues that Mrs. Smith did not articulate the nature of her indemnity claim, i.e., whether it was for temporary or permanent, partial or total disability. However, we note that Mrs. Smith's original 1008 asserted that no wage benefits had been paid, and it provided the details of her heart attack and subsequent surgery. At the bottom of the second page of the 1008 form, it states that

We agree.  This interpretation is particularly supportable in view of the opinion of Kinder's own expert, Dr. Elizardi, wherein even he did not specifically state that Mrs. Smith could return to work as a CNA.  Rather, he indicated that she had suffered an acute myocardial infarction on October 31, 2003, complicated by a respiratory arrest, and that she had reached maximum medical improvement except that she "does need conditioning and might benefit from rehabilitation."

In the present case, Mrs. Smith, who was sixty years old at the time of the second heart attack in 2003, testified that she could not do the work that she had done before at the nursing home.  She said that she was too slow and could not "get around fast enough like before."  She said that her body was too weak, and that she could not push a wheel chair.  The workers' compensation judge found her credible and sincere.

> In determining whether the worker has discharged his or her burden of proof, the trial court should accept as true a witness's uncontradicted testimony, although the witness is a party, absent "circumstances casting suspicion on the reliability of the testimony." *West* [ *v. Bayou Vista Manor, Inc.*], 371 So.2d [1146,] 1147[(La.1979)]; *Holiday v. Borden Chemical*, 508 So.2d 1381, 1383 (La.1987).  The trial court's determinations as to whether the worker's testimony is credible and whether the worker has discharged his or her burden of proof are factual determinations not to be disturbed on review unless clearly wrong or absent a showing of manifest error.  *Gonzales v. Babco Farms, Inc.*, 535 So.2d 822, 824 (La.App. 2d Cir.), *writ denied*, 536 So.2d 1200 (La.1988) (collecting cases).  Indeed, the manifest error/clearly wrong standard of appellate review applies in compensation actions even

the petitioner can attach a letter or petition with additional information or later amend the disputed claim form (1008).  Accordingly, Mrs. Smith obtained an attorney and amended her claim with a petition asserting that no wage benefits were being paid, no medical treatment had been authorized, that her heart attack occurred as a result of extraordinary work stress, and that she was entitled to penalties and attorney fees and "any medical and indemnity benefits possibly allowed" under this claim.  Although Kinder had apparently  terminated her wages around November 3rd or 5th, within days of her heart attack, it made no effort to discuss the extent of her disability or to determine what duties she could or could not perform, except to call her once to ask when she would be returning to work.  Given the original and amended claims for compensation, Kinder had sufficient  notice of the claims against it for any benefits allowed by law.

> when the trial court's decision is based solely upon written reports, records or depositions. *Virgil v. American Guarantee and Liability Insurance Co.*, 507 So.2d 825 (La.1987).

*Fluitt v. Christus Health Cent. Louisiana*, 05-0945, p. 11 (La.App. 3 Cir. 6/28/06), 935 So.2d 369, 377, *writ denied,* 06-2302 (La. 12/8/06), 943 So.2d 1094 (quoting *Bruno*, 593 So.2d at 361).

In *Fluitt*, where the hospital employee sustained a work-related medial meniscus injury and never returned to work, the employee had been released for light-duty work only, and it was undisputed that she could not return to her prior job duties. Citing *Banks v. Industrial Roofing & Sheet Metal Works, Inc*., 96-2840, p. 9 (La. 7/1/97), 696 So.2d 551, 556, we held that it was incumbent upon the employer to prove that the employee was physically able to perform a certain job and that the job was offered to her or that the job was available to her in her or the employer's community or reasonable geographic region. We stated: "The fact that [the employer] has the capability of modifying a job for a former employee is not tantamount to a job offer or job availability. Thus, as [the employer] did not meet its burden of proof, the WCJ did not err in awarding SEBs based on a zero earning capacity." *Fluitt*, 935 So.2d at 379.

Similarly, in the present case, we find no error on the part of the OWC in awarding medical benefits and wage benefits to Mrs. Smith based upon her pre-injury earnings from the date of her second heart attack. We find that she was temporarily totally disabled from October 31, 2003 until February 17, 2004 when Dr. Lie indicated that she could not work *full* duty, thereby implying that she could possibly work *light* duty. From February 17, 2004 forward, Mrs. Smith was entitled to supplemental earnings benefits based on a zero earning capacity, and this continues

16

until she has received vocational rehabilitation evaluations and until it is determined if and when she can return to work in a particular capacity and does return to work in some capacity, at which time the SEB's may be reduced, if applicable, based upon her new earnings.

## Penalties and Attorney Fees

Kinder further asserts that it reasonably controverted Mrs. Smith's claim of a work-related heart attack and that the OWC erred in awarding penalties and attorney fees to Mrs. Smith for Kinder's failure to pay wage and medical benefits. We disagree. More specifically, payments for temporary total disability benefits are due on the fourteenth day after the employer or insurer has knowledge of the injury, and supplemental earnings benefits are due on the fourteenth day after the employer or insurer has knowledge of the compensable supplemental earnings. La.R.S. 23:1201 (B) and (C). Subsection (F) provides in pertinent part as follows:

> F. Failure to provide payment in accordance with this Section or failure to consent to the employee's request to select a treating physician or change physicians when such consent is required by R.S. 23:1121 shall result in the assessment of a penalty in an amount up to the greater of twelve percent of any unpaid compensation or medical benefits, or fifty dollars per calendar day for each day in which any and all compensation or medical benefits remain unpaid or such consent is withheld, together with reasonable attorney fees for each disputed claim; however, the fifty dollars per calendar day penalty shall not exceed a maximum of two thousand dollars in the aggregate for any claim. The maximum amount of penalties which might be imposed at a hearing on the merits regardless of the number of penalties which might be imposed under this Section is eight thousand dollars. An award of penalties and attorney fees at any hearing on the merits shall be res judicata as to any and all claims for which penalties may be imposed under this Section which precedes the date of the hearing. Penalties shall be assessed in the following manner:

(1) Such penalty and attorney fees shall be assessed against either the employer or the insurer, depending upon fault. . . .

(2) This Subsection shall not apply if the claim is reasonably controverted or if such nonpayment results from conditions over which the employer or insurer had no control.

Accordingly, statutory penalties and attorney fees shall be awarded if the employer or insurer fails to timely pay benefits due to a workers' compensation claimant unless the claim is reasonably controverted or such nonpayment results from conditions over which the employer or insurer had no control; the arbitrary and capricious standard no longer applies. *See, Brown v. Texas-LA Cartage, Inc.*, 98-1063 (La. 12/1/98), 721 So.2d 885. "[I]n order to reasonably controvert a claim, the defendant must have some valid reason or evidence upon which to base his denial of benefits." *Id.* at 890. Employers are obligated to demonstrate that reasonable efforts were made to medically ascertain an employee's exact condition before denying workers' compensation benefits. *Hunter v. Alliance Compressors*, 06-100 (La.App. 3 Cir. 6/21/06), 934 So.2d 225.

In the present case, Kinder knew of Mrs. Smith's heart attack the day it happened because the van apparently brought her back to work unconscious before calling an ambulance to take her to the hospital. Even though Mrs. Smith was sixty years old and she had worked for the Kinder Nursing Home for twenty-two years, and was supposed to be on light duty due to a previous heart attack, Kinder had her on full duty. Then, without any evidence of a medical investigation at all, they terminated her wages a few days after the second heart attack—which was brought about while she was working on an unassisted full-duty assignment under extraordinary circumstances over 150 miles from the Kinder facility. Moreover,

18

Kinder made no efforts to have Mrs. Smith examined until it hired Dr. Elizardi for litigation purposes in April of 2005, a year-and-a-half after her heart attack.

We find that Kinder has presented no evidence that it reasonably controverted Mrs. Smith's claim and no evidence that the denial of benefits was due to conditions beyond its control. We review a decision of the OWC regarding the assessment of penalties and attorney fees pursuant to the manifest error standard. *Jackson v. Christus Health Central Louisiana*, 05-0983 (La.App. 3 Cir. 2/1/06), 922 So.2d 748, 756; *Olivier v. After Crash, Inc.*, 04-1655 (La.App. 3 Cir. 5/4/05), 901 So.2d 1214. Accordingly, we find no manifest error on the part of the OWC in awarding penalties and attorney fees for Kinder's failure to pay wage and medical benefits to Mrs. Smith.

## Reimbursement of Expenses

Kinder asserts that it was error for the OWC to award Mrs. Smith reimbursement of the expenses that she incurred in obtaining copies of her medical records and in obtaining a report from Dr. Arimura. However, Kinder offers no support for the assertion. Louisiana Revised Statutes 23:1310.8 provides that the expenses of the workers' compensation hearing, investigation, and medical examinations, shall be paid by the employer or insurance carrier, and such expenses may be included in the final award. Kinder's position is without merit.

## Adverse Presumption

Kinder cites as a question of law, the issue of whether Mrs. Smith's treating physicians, who were not called as witnesses at trial, should be assumed to have provided testimony unfavorable to her claim if they had been called as

witnesses. At trial, Kinder questioned Mrs. Smith regarding this issue over protests by her attorney that this was a legal question. The court allowed Kinder to ask Mrs. Smith whether her primary physician, Dr. Lie, and her surgeon, Dr. Dewitt, had related her heart attack to her job, but she did not understand the question. Counsel for Mrs. Smith argued that Dr. Lie is a charity hospital doctor, and that such physicians are not inclined to write reports about causation. He further stated that Mrs. Smith's physicians were not asked to provide testimony or an opinion regarding causation. We believe this last argument is key to the inquiry.

In other words, the cases addressing the adverse presumption that certain evidence is unfavorable when the party refuses to produce it generally revolve around an existing, available and/or subpoenaed document that the party refuses to produce. *See Munson v. Munson,* 00-348 (La.App. 3 Cir. 10/4/00), 772 So.2d 141 (holding that Mr. Munson's failure to provide subpoenaed bank records justified applying upon him an adverse inference and presumption that the records would have been unfavorable to his position regarding a community property issue); *see also, Hebert v. ANCO Insulation, Inc.,* 00-1929 (La.App. 1 Cir. 7/31/02), 835 So.2d 483, *writs denied,* 02-2956, 02-2959 (La. 2/21/03), 837 So.2d 629 (Whipple, J., concurring in part and dissenting in part) (when a litigant fails to produce *available* evidence and no reasonable explanation is made, there is a presumption that such evidence would be unfavorable; however, where plaintiffs assert the confidentiality of a settlement agreement, and the trial court orders production of the document for an in camera inspection, the adverse inference or presumption that the evidence would be unfavorable is not warranted).

In the present case, there is no available missing report that Mrs. Smith refuses to produce. All existing medical records of Mrs. Smith were produced,

20

including details of her treatment by Dr. Lie and Dr. Dewitt. Kinder did not depose any of Mrs. Smith's physicians or call any of them as witnesses at the trial. In fact, Kinder did not call one witness of its own at trial, not the employer or insurer, not the van driver, not the ambulance driver, no co-workers or supervisors of Mrs. Smith. The workers' compensation judge considered Mrs. Smith's medical records and the written reports of Dr. Arimura and Dr. Elizardi, and the testimony of Mrs. Smith, who was the only person called for testimony at trial. As previously stated, the judge committed no clear error in his evaluation of the evidence and testimony offered at trial, and the assumption of unfavorable testimony is inapplicable in this case.

**Offset**

Finally, Kinder asserts as error the OWC's failure to include in the judgment an offset or credit in its favor for payment of disability insurance premiums on behalf of Mrs. Smith, as well as any disability benefits paid to Mrs. Smith "as stipulated by counsel for the Claimant during trial." We note that the OWC did not provide for credits and offsets in its judgment. However, the workers' compensation judge stated that, "[t]he claim is compensable from that date [October 31, 2003] with appropriate credits and offsets allowed." At trial, Kinder questioned Mrs. Smith regarding her receipt of possibly six months worth of disability payments from AFLAC—but did not establish who paid those premiums—and questioned her regarding her ongoing receipt of social security disability benefits. That testimony was as follows:

> Q.  Okay. Now, after you're your heart attack, and after you had your bypass surgery, you have, in fact, filed for and obtained disability; isn't that correct?
>
> A.  Disability Social Security, yes.

21

Q.    Okay. Do you receive anything from AFLAC?

A.    Yes. I received it for my – for monthly, and it stopped. They cut it off.

Q.    Okay. How long did that last?

A.    . . . . I don't remember.

Q.    Wasn't it six months, ma'am?

A.    I don't remember. . . . I got some money from AFLAC, yes, in 2003, and a little bit in 2004.

Q.    Okay. Do you know how much you got?

A.    No. I have that at home.

MR. ZIMMERMAN: And if I may, Your Honor, if my client has received some disability payments from the employer, especially if the employer paid 100 percent of the premiums –

THE WITNESS: No.

MR. ZIMMERMAN: – I'll be happy – okay, hold on a second. Then, I'll be happy to stipulate to whatever offset they may be entitled to under the law, if you were to rule in her favor; but I need to know that. I don't.

THE COURT: Okay.

Q.    (BY MR. DAVIS) Are you presently receiving Social Security disability?

A.    . . . .
Social Security disability, yeah.

Q.    Okay. And when did that start?

A.    That started – let me think. January of 2005.

22

Q. Okay. And do you know how much that is?

A. It was . . . . Now I'm getting $570, right now. It was more than – it was like $600, but they take about $88 for insurance, Medicare supplement.

Q. What was the $88 for, ma'am?

A. Medicaid, Medicare, Medicare.

Q. And I take it, the amount that you made is on a monthly basis? You get that every month?

A. . . . . Yes, right at 570. They change it over, because I got a Medicare card.

At this point in the questioning, counsel for Kinder changed the line of questioning. Therefore, Kinder did not establish an amount, or argue, or provide evidence for a credit or offset for premiums that it may or may not have paid for the six months or so of AFLAC disability coverage that Mrs. Smith testified to receiving. Nor did Kinder establish definitively how much of a credit or offset it was seeking for the ongoing Social Security Disability benefits that Mrs. Smith testified to receiving. While the OWC did not and could not include an amount for credits and offsets in its judgment, it did intend for Kinder to receive the "appropriate credits and offsets allowed." Therefore, while we do not find error on the part of OWC, because it did not have enough information to make a specific award for credits and offsets, we must remand on the issue of offsets and credits, so that Mrs. Smith and Kinder can obtain the information that they need to determine whether Kinder paid AFLAC premiums and is entitled to offsets or credits therefor, and to determine the amount of credit or offset to which Kinder is entitled, if any, for the Social Security Disability benefits that Mrs. Smith is receiving.

**Attorney Fees on Appeal**

Mrs. Smith has requested additional attorney fees for the work necessitated by Kinder's appeal of her award pursuant to *Colonial Nursing Home v. Bradford*, 02-588 (La.App. 3 Cir. 12/30/02), 834 So.2d 1262, *writ denied,* 03-0364 (La. 4/21/03), 841 So.2d 802. There, we held that an award for attorney fees for work done on appeal is warranted when the appeal has necessitated additional work on the attorney's part. Accordingly, we award to Mrs. Smith additional attorney fees of $4,000.00 for the work done on appeal.

IV.

**CONCLUSION**

Based upon the foregoing, we affirm the judgment of the Office of Workers' Compensation, finding that Mrs. Smith suffered a compensable work-related coronary injury on October 31, 2003, pursuant to La.R.S. 23:1201, and awarding her wage benefits from that date based upon her weekly earnings of $223.24. We also affirm the award of medical benefits, expenses, penalties and attorney fees. We remand only for a determination of the amount of offsets and credits, if any, due to Kinder consistent with the opinion above. Finally, we award to Mrs. Smith an additional $4,000.00 in attorney fees for the work done on appeal. Costs of this appeal are assessed to Kinder Retirement and Rehabilitation Center.

**AFFIRMED AND REMANDED.**